**CARGILL, INCORPORATED,**
**Plaintiff-Appellant,**

v.

**Wayne E. PERLICH and Darlene Perlich, Husband and Wife, Defendants-Appellees,**

**and**

**Shipshewana State Bank, Intervening Claimant-Appellee.**

**No. 3–779A192.**

Court of Appeals of Indiana, Third District.

March 26, 1981.

Michael E. Armey, Rasor, Harris, Lemon & Reed, Warsaw, for plaintiff-appellant.

Richard K. Muntz, LaGrange, for defendants-appellees.

HOFFMAN, Presiding Judge.

This action was initiated by Cargill, Inc. against Wayne and Darlene Perlich for the replevin of hogs under a security agreement and the collection of unpaid sums due on promissory notes. Upon the filing of the complaint, Cargill also filed an affidavit for immediate possession of the hogs. At the hearing[1] on Cargill's request, Shipshewana State Bank appeared and moved to intervene, claiming a superior interest in the hogs. The Bank also sought to collect sums due and owing by the Perlichs on certain promissory notes. The trial court granted the Bank's motion to intervene and awarded immediate possession of the hogs to Cargill. Following the filing of a replevin bond by Cargill, the court issued a writ of replevin. The case was tried to the court, after a change of venue on May 2, 1977. Judgment was entered in the words and figures following:

> "The above parties having either appeared in person or by their respective counsel and the Court having heard evidence and being duly advised in the premises and having considered the pleadings on file as well as the variour [sic] Motions and Memorandum of Law and Citations of Authority now finds as follows:
>
> 1. That the defendants, Wayne E. and Darlene Perlich, are indebted to Shipshewana State Bank, intervening claiments [sic], in the amount of $15,500.00 as evidenced by certain promissory notes given the Shipshewana State Bank. The notes being introduced into evidence at trial are as follows; number 8683 for $3,500.00, 8305 for $7,000.00, 7716 for $2,000.00, 8680 for $3,000.00.

---

1. A transcript of the replevin hearing is not included in the record before this Court.

2. That a security interest was given to Shipshewana State Bank on certain livestock of the defendants' Perlichs on said notes and that a financing statement was filed pursuant to I.C. 26–1–9–402 on April 19, 1972.

3. That subsequent to April 19, 1972, the defendants gave a security interest in livestock they had in their possession to plaintiffs, Cargill, Inc. in exchange for feed Cargill, Inc. provided to them. Plaintiff filed its financing statement September 20, 1972, to perfect its security interest in the above mentioned livestock.

4. That said Cargill, Inc. had constructive notice of Shipshewana State Bank's interest of said livestock at the time of their filing of a financing statement for livestock in the possession of and ownership of the defendants' Perlichs.

5. That evidence presented at trial convinces the Court that Cargill, Inc. had actual knowledge of Shipshewana State Bank's interest in that certain conversations took place between the Bank and Cargill, Inc., as to the Bank's prior perfected interest and their refulsa [sic] to give up their priority rights.

6. That thereafter the Honorable Robert Probst did grant a writ of replevin for 280 head of hogs based on sworn testimony of Cargill, Inc. that the value of said hogs were [sic] in excess of $15,000.00 at said time and place.

7. That Cargill, Inc. post a replevin bond in the amount of $17,000.00 and took [sic] possession of 231 head of hogs and in a commercially reasonable manner marketed said hogs, receiving $13,-383.22. This amount is reached through the evidence presented by Cargill, Inc. that the defendants owed them $27,900.00 for feed they provided the Perlichs and a balance still owing of $14,516.78 the proceeds of the above mentioned sale being applied to the original debt of $27,900.00.

8. That there was no evidence that Cargill, Inc. marketed any more than 231 head of hogs taken from Perlichs'

farm, and therefore Cargill, Inc. is only liable for the proceeds of any hogs they did market, that being 231 head of hogs and not 280 as Shipshewana State Bank contended in their cross-complaint.

9. That the proceeds of the above mentioned sale ($13,383.22) be turned over to Shipshewana State Bank as the defendants' Perlichs were indebted to them in an amount in excess of the amount of the proceeds ($15,500.00).

10. That plaintiff, Cargill, Inc. take nothing on its complaint against Shipshewana State Bank.

11. That defendants' Perlichs are indebted to Cargill, Inc. in the amount of $27,900.00 and to Shipshewana State Bank for $2,116.78.

12. That in order to obtain its writ of replevin, the Plaintiff filed a written undertaking in the amount of $17,-000.00 with Ohio Casualty Insurance Company as surety and said bond should not be released until the aforesaid Judgment is paid.

13. That Cargill, Inc. initiated this litigation after having knowledge of Shipshewana State Bank's prior perfected interest in the aforesaid hogs and that Shipshewana State Bank is therefore entitled to reasonable attorneys fees. The Court finds that [sic] reasonable attorneys fees in the amount of $2,750.00.

"IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED BY THE COURT,

A. That Shipshewana State Bank have judgment against Cargill, Inc. on the amount of $13,383.22, the same being the amount of proceeds Cargill, Inc. realized from the sale of the hogs pursuant to an executed writ of replevin granted by the Honorable Robert Probst.

B. That Cargill, Inc. have judgment against Wayne E. Perlich and Darlene Perlich in the amount of $27,900.00.

C. That Shipshewana State Bank have judgment against Wayne E. Perlich and Darlene Perlich in the amount of $2,116.78.

D. Costs are hereby taxed and made a judgment against the plaintiff Cargill, Inc., and the judgment held by Shipshewana State Bank shall be without relief from valuation and appraisement laws and with attorneys fees.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Ohio Casualty Company is surety for the undertaking of Plaintiff in the sum of $17,000.00 and that said bond shall not be released until said judgments against Cargill, Inc. and in favor of Shipshewana State Bank is fully paid."

Cargill filed its motion to correct errors on May 7, 1979. The court granted the motion only insofar as attorney's fees awarded to the Bank were assessed against the Perlichs rather than against Cargill. This appeal was then brought by Cargill. No brief on appeal has been filed on behalf of the defendants Perlich.

The sequence of events which created this dispute may be summarized as follows:

On April 19, 1972 the Shipshewana State Bank filed with the Recorder of Noble County a financing statement signed by Wayne Perlich claiming a "purchase money interest in all livestock on the Wayne E. and Darlene Perlich farms...." Proceeds of the collateral were also included.

On September 20, 1972 Cargill filed with the Recorder of Noble County a financing statement signed by Wayne Perlich claiming a security interest in "[a]ll swine now owned or hereafter acquired including any progeny, additions thereto or replacements thereof."

On December 12, 1973 Wayne Perlich entered into the first security agreement with the Bank which listed the collateral as certain enumerated hogs. On the 9th day of January 1974 Mr. Perlich signed the second security agreement with the Bank which again listed certain hogs as the collateral. Both agreements included the "young, products and produce" of the collateral.

Funds from the first agreement were not to be used to purchase the collateral. The second agreement was to provide purchase money except for a $500 allowance to a feed mill.

On June 10, 1974 Wayne Perlich and Steven Tucker, a representative for Cargill, completed a statement of feeder financing which reflected a $9,700 security interest in favor of Shipshewana State Bank on all livestock which was due in June 1974. Perlich and Cargill then entered into three security agreements which described certain types of hogs as the collateral and included "all additions, substitutions, replacements, progeny and proceeds...."

Perlich subsequently defaulted in making payments due under the security agreements and Cargill brought suit to recover the collateral and the balance due on the security agreements. The decision of the trial court granted priority to the Bank's security interest and Cargill now appeals that decision.

Cargill first contends that as a matter of law the collateral description contained in the Bank's security agreements is insufficient to confer on the Bank a security interest in the hogs which were awarded to Cargill at the prejudgment replevin hearing. Each security agreement lists the types of hogs covered and gives their appraised value. The descriptions in both agreements are followed by the phrase "together with the young, products and produce thereof...." No reference is made in either agreement to after-acquired property or proceeds from the sale of the collateral. Cargill maintains that the Bank failed to prove that the hogs which Cargill replevied were the same hogs in which the Bank held its security interest. The Bank, as the party claiming a security interest, bears the burden of proving its interest in the collateral.

■ Under the Uniform Commercial Code, a party can only claim a security interest in property when the debtor has signed a security agreement and the agreement contains a description of the collater-

al. IC 1971, 26–1–9–203(1)(b) (Burns Code Ed.). Furthermore, such an interest does not attach to the collateral until there is agreement that it attach, value is given and the debtor has rights in the collateral. IC 1971, 26–1–9–204(1). Until the foregoing is fulfilled, no security interest attaches to the collateral.

▮▮▮ Under the theory proposed by Cargill, the controlling factor is the language used to describe the collateral in the Bank's security agreement. IC 1971, 26–1–9–110 gives the test to be used in determining the sufficiency of the description.

"For the purposes of this article [chapter] any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described."

The Bank's security agreements identified the collateral as 90 open gilts, 10 male hogs, 25 brood sows, 90 feeder pigs and 92 mixed spotted and Hampshire feeder shoats. Thus, under the theory proposed by Cargill, the Bank must prove that the hogs which Cargill replevied and later sold matched the description set forth above. Under usual conditions, Cargill's theory may be correct. However, this case presents an exceptional situation because the acts of Cargill have made it impossible for the Bank to meet its burden of proof. Possession of the hogs was obtained by Cargill following the replevin hearing and the hogs remained under Cargill's control until they were sold. No accounting of the hogs was made by Cargill at the time possession was gained or at the time of sale. Pursuant to the replevin order, the Sheriff seized the hogs and accounted for 237 animals. No further description or information about the animals was provided by the Sheriff. The district manager for Cargill testified that 232 hogs were sold but was unable to describe the types of hogs.

Thus, it is clear that Cargill obtained possession and control of the hogs yet failed to fully account for and properly describe the animals. Therefore, it would be quite unfair to require the Bank to prove certain facts which Cargill failed to provide. As a secured creditor, Cargill bears the burden of showing, as a part of its burden of proof in an action for a deficiency judgment, that the sale or disposition of the collateral was performed in a commercially reasonable manner. This responsibility includes the duty to properly account for the number and type of items sold. *Hall v. Owen Cty. State Bank* (1977), Ind.App., 370 N.E.2d 918. Cargill will not be permitted to benefit from its own failure to account. Therefore, in this case, the impossibility of performance created by Cargill's error will relieve the Bank from the responsibility of proving the identity of the hogs which Cargill sold. For these reasons, the appellant's first assignment of error must fail. It is further noted that the inadequacy of the security agreement description would serve as a bar to the Bank's recovery only if the hogs were sold by a livestock market and the Bank was attempting to satisfy its lien by an action against the market for conversion. *Batey Land & Livestock Co. v. Nixon* (1977) 172 Mont. 99, 560 P.2d 1334.

▮▮▮ Cargill next argues that the evidence is insufficient to support a finding that the Bank had a security interest in the hogs awarded to Cargill at the replevin hearing.

" 'In determining whether a judgment is supported by sufficient evidence, this Court neither weighs the evidence nor resolves questions of credibility of witnesses. Rather, this Court views only the evidence most favorable to the appellee, together with all logical inferences flowing therefrom. *Rieth-Riley Construction Co., Inc. v. McCarrell* (1975) [163 Ind.App. 613], 325 N.E.2d 844.' "

*Dubreuil v. Pinnick* (1978), Ind.App., 383 N.E.2d 420, at 421.

It is Cargill's position that the only reasonable inference which can be drawn from the evidence presented at trial was that the hogs awarded to Cargill were not the same ones described in the Bank's security agreements. In a hog farm operation such as the one here involved, new hogs are purchased, fattened and sold every six months. The Bank's security agreements which specifi-

cally described the hogs were entered into on December 12, 1973 and January 9, 1974. The replevin hearing occurred in February 1975. Thus, Cargill contends that the hogs which it replevied could not have been the same hogs which were listed in the security agreements. The hogs in which the Bank had an interest would have been sold during the summer of 1974. Therefore, argues Cargill, the Bank no longer had an interest in the hogs.

The Bank contends that the phrase "together with the young, product and produce thereof" creates an interest in the proceeds and after acquired property which were replacements of the original collateral. A security interest in after acquired collateral is governed by IC 1971, 26–1–9–108 which states:

> "Where a secured party makes an advance, incurs an obligation, releases a perfected security interest, or otherwise gives new value which is to be secured in whole or in part by after acquired property his security interest in the after acquired collateral shall be deemed to be taken for new value and not as security for an antecedent debt if the debtor acquires his rights in such collateral either in the ordinary course of his business or under a contract of purchase made pursuant to the security agreement within a reasonable time after new value is given."

This Code provision was comprehensively analyzed by Ray D. Henson in " 'Proceeds' Under the Uniform Commercial Code" 2 U.C.C.Rep.Serv. 566, 571–575.

> "This section [9–108] provides that in our situation, where a financer has put new money into a debtor's business to finance constantly changing collateral, the security interest in the new collateral is taken for new value where the debtor's rights are acquired in the ordinary course of business, because as far as individual items of 'inventory' are concerned the secured party's rights are lost when the items are sold. In effect, the section is simply a provision for recognizing substituted collateral.... But where inventory qua inventory is the collateral, the interest in the property is 'deemed' to be taken for new value on the theory that the security interest in the inventory (and not the individual items composing it) relates back to the time of original attachment and perfection, when new value was given. Tracing the continuous substitutions would be difficult, if not impossible; it would also be unnecessary....
> "The Code provides for a security interest to continue in proceeds as inventory is sold. [IC 26–1–9–306(2)] This intermediate step of 'proceeds' is the factor which seems so often ignored by those who argue that as inventory is sold it must be contemporaneously replaced. Under the Code, an interest also continues in whatever is received upon the disposition of the proceeds; in this way, a continuous, perfected security interest is provided— inventory, proceeds, inventory again, more proceeds, and so on. In short, to say that a debtor and secured party legally need not engage in a continuing turnover, pay-over arrangement to have a perfected, non-attackable transaction is simply to recognize that modern facts of life do not require needless acts of no benefit to other creditors. The Code merely allows the financer and debtor to accomplish by a simple means what they could unquestionably do by a more elaborate arrangement. The recognition of substituted collateral in Section 9–108, is a result that would necessarily be reached, independently of the section, by any referee or judge. To require further tracing would be to demand a futile act. With a filed financing statement of record, no one is misled in this kind of financing.
> " ... The interest in the proceeds which are substituted collateral, dates back to the original perfection of the security interest in the financed collateral...."

See also Holzman v. L. H. J. Enterprises, Inc. (9th Cir., 1973) 476 F.2d 949. This theory of substituted collateral is applicable in the present case. Mr. Paul Hostetler, Executive Vice President of the Shipshewana State Bank testified concerning the ongoing hog program at Mr. Perlich's farm.

He described a continuous farrowing and fattening operation in which hogs were sold and replaced. Pursuant to IC 1971, 26–1–9–108 the Bank's security interest attaches to the substituted collateral and relates back to the time of the original attachment and perfection. Thus, the Bank did have a valid security interest in the hogs which Cargill replevied and sold.

■ The final assignment of error attacks the description of collateral in the financing statement. Cargill argues that the security interest should be limited to the financing statement description of "purchase money interest in all livestock." This argument misconstrues the purpose of the collateral description under the Uniform Commercial Code. As discussed under the first issue, descriptions of collateral are governed by IC 1971, 26–1–9–110 which requires only that specificity which is necessary to reasonably identify what is described. This Code section was discussed in *In re Malzac* (D.C.Vt.1974) 14 U.C.C.Rep.Serv. 1223, 1226.

"The requirement as to sufficiency of description under the UCC is spelled out in Title 9A § 9–110, as follows: 'For the purposes of this article, any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described.'

"It is noted that under the comments pertaining to this section, the test of sufficiency of a description is that the description do the job assigned to it—that it make possible the identification of the things described. And, under this Rule, courts should refuse to follow the holding, often found in the old chattel mortgage cases, that descriptions are insufficient unless they are of the most exact and detailed nature, the so-called 'serial number' test. It necessarily follows that under the Uniform Commercial Code great liberality is afforded in determining the sufficiency of the description of collateral. This view seems to have unanimous support in the reported cases relating to the issue. The test seems to be that if the description of the collateral is sufficient to direct inquiry on the part of the party examining it the requirements

of the UCC as to constructive notice have been met. *First State Bank of Nora Springs, Iowa v. Waychus*, (Iowa Sup Court 1971) 8 UCC Rep Service 762, 765; *Ray v. City Bank & Trust Co. of Natchez, Mississippi* (USDCS Ohio 1973) 13 UCC Rep Ser 355, 358 F.Supp. 630; *Donald v. Madison Industries, Inc.* (USCA 10th Cir., 1973) 483 F.2d 837 [13 UCC Rep 918]; *Biggins v. Southwest Bank* (USCA 9th Cir., 1973) 13 UCC Rep Ser 928."

The description in the present case is of sufficient certainty that an ordinarily prudent credit searcher would make an inquiry as to the exact nature and extent of the collateral secured. The intent of the UCC is to abolish formal detailed procedural requirements and to rely, instead, on commercial reasonableness. Narrow technical interpretations will not be favored.

Based on the foregoing analysis, Shipshewana State Bank had a valid and enforceable security interest in the hogs which Cargill replevied and subsequently sold. Therefore, the decision of the trial court in favor of Shipshewana State Bank and against Cargill is hereby affirmed.

Affirmed.

STATON, J. and CHIPMAN, J., participating by designation, concur.