**In the Matter of Larry S. HOLLIE and Sherry R. Hollie, Debtors.**

**UNITED STATES of America, Movant,**

**v.**

**Larry S. HOLLIE and Sherry R. Hollie, Respondents.**

**Bankruptcy No. 84–50098–Mac.**

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

July 20, 1984.

Lillian H. Lockary, Asst. U.S. Atty., Macon, Ga., for the U.S.

William M. Flatau, Brown, Katz, Flatau & Hasty, Macon, Ga., for Larry S. Hollie and Sherry R. Hollie.

## MEMORANDUM OPINION ON MOTION FOR MODIFICATION OF THE STAY AND ABANDONMENT

ROBERT F. HERSHNER, Jr., Bankruptcy Judge.

### STATEMENT OF THE CASE

On January 30, 1984, Larry S. Hollie and Sherry R. Hollie, Debtors, filed a petition

for relief under Chapter 11 of the United States Bankruptcy Code. Before the Court is the "Motion for Modification of the Stay and Abandonment" filed by the United States of America, United States Department of Agriculture, Farmers Home Administration (hereinafter FmHA), on June 6, 1984. The motion alleges that Debtors' debt to FmHA is secured by real estate, crops, farm equipment, livestock, and farm products and proceeds. The motion further alleges that Debtors have proposed no plan of reorganization, that there is no prospect for a successful reorganization, and that FmHA is not adequately protected. The motion also states that FmHA has in its possession a $14,633.30 check payable to Mr. Hollie from the Commodity Credit Corporation,[1] representing payment to Mr. Hollie under the Milk Diversion Program. FmHA claims the check as collateral for Debtors' debt to FmHA. FmHA requests relief from the automatic stay, 11 U.S.C.A. § 362 (West 1979 & Supp.1984), and for leave to foreclose on Debtors' real estate, farm equipment, crops, and livestock. FmHA also requests that the Court order Mr. Hollie to endorse the Commodity Credit Corporation check so that it may be applied to Debtors' debt with FmHA.

FmHA's motion came on to be heard on June 20, 1984. At the hearing, the Court heard evidence on FmHA's motion for modification of the automatic stay. The Court also took up the issues of whether FmHA is adequately protected so as to authorize Debtors' use of cash collateral, and whether FmHA should be held in contempt for seizing Mr. Hollie's Milk Diversion Program check. The Court has considered the evidence presented at the hearing and the briefs of counsel, and the Court will now publish its findings of fact and conclusions of law.

1. The Commodity Credit Corporation is an agency of the United States Department of Agriculture.

2. The Federal land bank holds the first lien on the farmland.

## FINDINGS OF FACT

Beginning in 1979, Debtors began to operate a farm located in Washington County, Georgia. The farming operation is primarily a dairy operation, but Debtors, on occasion, have planted row crops and raised feeder pigs.

To finance the farming operation, Debtors obtained loans from FmHA and executed promissory notes to evidence the indebtedness. Debtors' transactions with FmHA can be summarized as follows:

| Date | Amount of Loan | Purpose of Loan |
|---|---|---|
| May 16, 1979 | $200,000.00 | to start farm operation |
| May 23, 1979 | 155,250.00 | emergency |
| August 29, 1979 | 42,700.00 | emergency |
| November 6, 1979 | 35,000.00 | emergency |
| February 8, 1980 | 30,650.00 | to pay operating expenses |
| May 5, 1980 | 25,000.00 | emergency |
| August 11, 1980 | 60,000.00 | emergency |
| November 28, 1980 | 19,400.00 | emergency |
| December 9, 1980 | 18,150.00 | emergency |
| January 16, 1981 | 57,440.00 | emergency |
| January 22, 1981 | 36,800.00 | emergency |
| March 25, 1981 | 34,500.00 | emergency |
| June 9, 1981 | 8,400.00 | emergency |
| July 6, 1981 | 71,350.00 | to pay operating expenses |
| January 28, 1983 | 31,770.00 | emergency |

With the exception of the initial loan of May 16, 1979, and the two loans for operating expenses on February 8, 1980, and July 6, 1981, the loans were emergency loans made to Debtors primarily because of losses resulting from their row crops. The emergency loans were made as a result of a severe drought that caused Washington County to be declared a disaster area. As of the date of the bankruptcy filing, Debtors' debt to FmHA approximated $1,000,000.00.

To secure their indebtedness with FmHA, Debtors granted to FmHA a second lien on their farmland.[2] To further secure the debt, Debtors executed security agreements that purport to give [3] FmHA a security interest in farm equipment and crops. The security agreements also pur-

3. Debtors argue that the security agreements are invalid because they do not contain a granting clause. The Court will address this argument later in its opinion.

port to give FmHA a security interest in: "All livestock (except livestock and poultry kept primarily for subsistence purposes), fish, bees, birds, furbearing animals, other animals produced or used for commercial purposes, other farm products, and supplies, now owned or hereafter acquired by Debtor, together with all increases, replacements, substitutions, and additions thereto...." FmHA filed a financing statement on May 16, 1979, and filed several financing statements thereafter.

In the ordinary course of Debtors' dairy operation, Debtors sell milk to Dairymen, Inc. Debtors assigned to FmHA approximately $4,700.00 of their monthly receipts from Dairymen, Inc., and the assignment was to be applied by FmHA against Debtors' indebtedness. FmHA later released the assignment so that Debtors could use the proceeds to pay their operating expenses.

At an undisclosed time, Debtors incurred a $70,000.00 debt to Goldkist, Inc. for feed, fertilizer, and other farm supplies. Debtors were unable to pay the debt, and Goldkist obtained a judgment against Debtors. In June of 1983, Goldkist instituted a garnishment proceeding against Debtors by serving a summons of garnishment upon Dairymen, Inc. As a result of the garnishment, Debtors cash flow from Dairymen, Inc. was all but stopped. FmHA then made the January 28, 1983, $31,770.00 loan to Debtors. As part of the loan transaction, FmHA obtained a nondisturbance agreement from Goldkist, which was intended to prevent Goldkist from levying on Debtors' farmland and equipment. To help deal with the farm expenses, Mr. Hollie took a job as a car salesman and Mrs. Hollie started to drive a school bus on a part-time basis. Debtors also sold some cows, without the consent of FmHA, in order to pay farm expenses. The garnishment continued until Debtors filed their bankruptcy petition, and testimony was that Dairymen, Inc. owed Debtors $3,459.50 on the date of the bankruptcy filing. On February 7, 1984, the Court entered a consent order allowing Debtors to use milk proceeds. Since the order, Debtors have received $9,000.00 to $10,-000.00 per month in milk proceeds.

Immediately before filing their bankruptcy petition, Debtors applied to participate in the Milk Diversion Program. The Milk Diversion Program is administered by the Commodity Credit Corporation. Under the program, a farmer agrees to decrease his milk production, and the Commodity Credit Corporation pays a subsidy to the farmer for his reducing production. The program will last until March 31, 1985. Debtors did not have to reduce the size of their herd to qualify for the program because they had already sold some cows to pay expenses. After the bankruptcy filing, Debtors were approved to participate in the Milk Diversion Program,[4] and on April 4, 1984, this Court entered an order authorizing Debtors to participate in the program. Under the program, Debtors will receive approximately $14,000.00 four times per year until March 31, 1985.

The Commodity Credit Corporation, in accordance with the program, issued a check in the amount of $14,633.30 payable to Mr. Hollie, but did not forward it to him. Instead, the Commodity Credit Corporation forwarded the check to the office of the General Counsel of the United States Department of Agriculture. Ms. Lillian Lockary, an assistant United States Attorney representing FmHA, stated that the Commodity Credit Corporation forwarded the check to the General Counsel's office because the Commodity Credit Corporation understood that FmHA had a security interest in the check.

At present, Debtors have abandoned their row crop and feeder pig operations and now focus their efforts solely on the dairy operation. They receive $9,000.00 to $10,000.00 per month in milk proceeds. Debtors are paying the Federal land bank

---

**4.** At the hearing, neither Debtors nor FmHA tendered into evidence a copy of the Milk Diversion Program contract between Debtors and the Commodity Credit Corporation. Upon stipulation of the parties, FmHA provided the Court with a copy of the contract and other information concerning the Milk Diversion Program after the hearing.

on its first mortgage, and have a monthly surplus of $1,500.00 after paying the Federal land bank and paying other expenses.

The evidence reveals that the farmland has a value of $195,000.00 to $250,000.00. The farm equipment has a value of $52,000.00, and the livestock has a value of $49,000.00. The evidence reveals that the value of the farmland has decreased over the past several years, but no additional decrease in value is expected to occur in the near future. Debtors testified that the farm equipment is being properly maintained and stored in a shed. The dairy herd is in good condition, and the size of the herd is increasing through the birth of calves.

Debtors testified that with the increase in calves, they expect a substantial increase in milk production by the end of the Milk Diversion Program in 1985. In what Debtors termed a conservative estimate, they testified that they should gross $16,000.00 to $17,000.00 per month, and after payments to FmHA and the Federal land bank, and the payment of expenses and insurance, they would net $5,300.00 per month. Mrs. Hollie testified that it would be March of 1985 before Debtors could begin to pay FmHA without the use of the Milk Diversion Program payment, but that with the quarterly payment of $14,000.00, Debtors now could formulate a plan to deal with their debts.

Debtors testified that the farm could successfully reorganize, but Mr. Lewis Roberts, the FmHA county supervisor for Washington County, disagreed, noting poor management on the part of Debtors.[5] Mr. Roberts also noted that the dairy herd has been reduced in size.

### CONCLUSIONS OF LAW

FmHA's motion for relief from the automatic stay is based on 11 U.S.C.A. § 362(d) (West 1979), which provides:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

11 U.S.C.A. § 362(g) (West 1979) sets forth the burdens of proof to be applied in a section 362(d) motion. Section 362(g) provides:

In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—

(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

(2) the party opposing such relief has the burden of proof on all other issues.

■ Under section 362(d), FmHA first argues that it is not adequately protected.[6] Adequate protection requires that the secured creditor's interest in collateral be protected. It protects the secured creditor against a decline in the value of his collateral. Collier on Bankruptcy notes:

The most important message of the Code with respect to the treatment of entities with an interest in property of the estate is that their remedies may be suspended, even abrogated, their right of recourse to collateral may be terminated

---

5. Mr. Roberts noted that Debtors were poor managers because they incurred a $70,000.00 debt with Goldkist for feed. In fact, the debt was for feed, fertilizer, and other farm supplies. Mr. Roberts also stated that Debtors were poor managers because they sold cows to pay farm expenses without FmHA's consent.

6. Adequate protection is not defined in the Bankruptcy Code, although some examples of adequate protection are listed in 11 U.S.C.A. § 361 (West 1979).

as it is consumed in the business, but the value of their secured position as it existed at the commencement of the case is to be protected throughout the case when adequate protection is required. . . . Of course in some instances where collateral is appreciating, nothing will need to be done by the trustee as the mere passage of time may constitute adequate protection.

2 Collier on Bankruptcy ¶ 361.01[1] (15th ed. 1984). *See also Barclays Bank v. Saypol (In re Saypol)*, 31 B.R. 796, 10 B.C.D. 1057 (Bankr.S.D.N.Y.1983); *In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 8 B.C.D. 1402, 6 C.B.C.2d 713 (Bankr.S.D. N.Y.1982).

■ The Court concludes that FmHA is adequately protected as to the farmland. The evidence reveals that the value of the farmland is not likely to decrease. Moreover, Debtors are making payments to the first lienholder, the Federal land bank. These payments reduce the principal on the first lien and thus increase FmHA's collateral position. These payments to the Federal land bank will compensate FmHA for any possible decline in the value of the farmland. *See Loper v. Mulcahy (In re Mulcahy)*, 5 B.R. 558 (Bankr.D.Conn.1980).

Debtors argue that the security agreements for crops and chattels executed by Debtors in favor of FmHA are invalid because they do not contain a clause that "grants" a security interest to FmHA. Debtors therefore argue that adequate protection is not required as to the crops, livestock and offspring, farm products, and proceeds because FmHA does not have an interest in them.

O.C.G.A. § 11–9–105(1)(*l*)(Michie 1982) defines a security agreement as "an agreement which creates or provides for a security interest." Security interest is defined as "an interest in personal property or fixtures which secures payment or perform-

ance of an obligation." O.C.G.A. § 11–1–201(37) (Michie 1982). Georgia law further defines an agreement as "the bargain of the parties in fact as found in their language or by implication from other circumstances. . . ." O.C.G.A. § 11–1–201(3) (Michie 1982). Section 11–1–201(3) further provides: "Whether an agreement has legal consequences is determined by the provisions of this title, if applicable; otherwise by the law of contracts. . . ."

■ Georgia law therefore does not require "magic words" to create a valid security interest. A clause that specifically grants a party a security interest is not necessary. Rather, the Court must refer to the general law of contracts and determine whether the parties intended to create a security agreement. *Barton v. Chemical Bank*, 577 F.2d 1329 (5th Cir.1978); J. White & R. Summers, Uniform Commercial Code 904–07 (2d ed. 1980) (hereinafter White & Summers).

■ In this adversary proceeding, FmHA's written form 440–4, which was signed by Debtors, bears the heading "Security Agreement (chattels and crops)." The form also refers to FmHA as the "Secured Party." Moreover, the form provides: "It is the purpose and intent of this instrument that . . . this instrument shall secure payment of the note. . . ." Considering this language, and other language in the form, the Court concludes that Debtors granted FmHA a security interest in crops, livestock and offspring, farm equipment, and farm products. *See generally* White & Summers at 906–07. The security interest was perfected by FmHA's filing of the financing statements. O.C.G.A. § 11–9–302 (Michie 1982).

■ Having determined that FmHA has a validly perfected security interest in Debtors' farm equipment and livestock,[7] the Court will turn to the issue of adequate

---

**7.** FmHA argues that it has a security interest in the Milk Diversion Program check. For purposes of section 362(d), the value of the check is not subject to decline, and relief from the stay is not appropriate. If FmHA has a security interest in the check, it is cash collateral, 11 U.S.C.A. § 363(a) (West 1979), and Debtors must meet the requirements of 11 U.S.C.A. § 363(c)(2) (West 1979) before it can be used by Debtors. The court will address this issue later in its opinion.

protection. Debtors testified that the farm equipment is being maintained, and that it is stored in a shed. FmHA did not produce any evidence that the equipment would decline in value. The Court thus concludes that the value of FmHA's security interest in the farm equipment is adequately protected. The value of FmHA's security interest in livestock is also adequately protected since the cows are in good condition. Also, the evidence reveals that the dairy herd is increasing because of the birth of calves. This will protect FmHA's interest in the dairy herd.

FmHA also argues that under section 362(d)(2), the automatic stay should be lifted because Debtors have no equity in the collateral, and the collateral is not necessary for an effective reorganization. Debtors concede that there is no equity in the collateral, but it is clear that Debtors cannot reorganize without the farmland, livestock, and equipment. FmHA, however, argues that the collateral is not necessary for an *effective* reorganization.

■ For the automatic stay to be terminated, the collateral must not be necessary for an "effective reorganization." 11 U.S.C.A. § 362(d)(2)(B) (West 1979). "Effective reorganization" implies that there must be a reasonable chance for a debtor to reorganize. If it is clear that there is no reasonable chance of reorganization, the automatic stay should be lifted. *See Terra Mar Development Corp. v. Terra Mar Associates (In re Terra Mar Associates)*, 3 B.R. 462, 6 B.C.D. 150 (Bankr.D.Conn. 1980). In the early stages of a bankruptcy case, a court should balance the interests of the secured creditor against the congressional policy favoring reorganization. The court should be hesitant to find no reasonable possibility of reorganization, especially where the debtor has not had sufficient time to formulate a plan. *In re Heatron, Inc.*, 6 B.R. 493, 6 B.C.D. 1008 (Bankr.W.D. Mo.1980).

■ In this case, the Court finds that there is a reasonable chance that Debtors can reorganize. Debtors have abandoned the row crop and feeder pig operations, which have been the major causes of Debtors' losses. Debtors note that their dairy herd is increasing in numbers, and that they expect milk sales to increase. Debtors estimate that they will be able to realize a net profit of $5,300.00 after payments to creditors. The Court does not believe that Debtors are such poor managers that a successful reorganization would be impossible. Since FmHA is adequately protected, and the Court finds a reasonable chance of reorganization, the Court will not lift the automatic stay.

The Court now will turn to whether Debtors may use FmHA's cash collateral. 11 U.S.C.A. § 363(c)(2) (West 1979) provides:

> The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
>
> > (A) each entity that has an interest in such cash collateral consents; or
> >
> > (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.[8]

In order for the Court to approve the use of cash collateral, the requirements of 11 U.S.C.A. § 363(e) (West 1979) must be met. That section provides:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. In any hearing under this section, the trustee has the burden of proof on the issue of adequate protection.

Unless the requirements of section 363(c)(2) and (e) are met, Debtors must segregate and not use the cash collateral. 11 U.S.C.A. § 363(c)(4) (West 1979).

---

**8.** Although section 363(c)(2) applies to the trustee, under 11 U.S.C.A. § 1107 (West 1979), the debtor in possession has the rights, powers, and duties of a trustee.

■ Cash collateral is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents in which the estate and an entity other than the estate have an interest." 11 U.S.C.A. § 363(a) (West 1979). The Milk Diversion Program payment and the milk proceeds are cash equivalents, and the question therefore is whether FmHA has an interest in them. Debtors argue that FmHA does not have a security interest in either the postpetition milk proceeds or the Milk Diversion Program payment, and that adequate protection therefore is not required. The Court first will address the milk proceeds.

Debtors do not dispute that FmHA has a security interest in the milk proceeds produced before the bankruptcy filing.[9] Debtors, however, argue that FmHA's security interest does not attach to postpetition milk proceeds. Section 552 of the Bankruptcy Code determines the postpetition effect of a security interest. That section provides:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b) Except as provided in sections 363, 506(c), 544, 545, 547, and 548 of this title, if the debtor and a secured party enter into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to the extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C.A. § 552 (West 1979).

■ In this case, FmHA's security agreement extends to livestock, after-acquired livestock, farm products, increases,[10] replacements, substitutions, and additions. Under O.C.G.A. § 11–9–109(3) (Michie 1982), milk is specified to be a farm product. Under section 552(b), FmHA continues to have a security interest in the milk produced by Debtors' cows after the bankruptcy filing.

■ O.C.G.A. § 11–9–306(2) (Michie 1982) provides:

Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

Therefore, when Debtors sell the milk to Dairymen, Inc., FmHA's lien on postpetition milk attaches to the proceeds of the sales.[11] *Citicorp (USA), Inc. v. Davidson Lumber Co.*, 718 F.2d 1030 (11th Cir.1983); *Barnett Bank v. Applegate*, 379 So.2d 1284, 25 U.C.C.Rep.Serv. 320 (Fla.Dist.Ct. App.1978), *vacated on other grounds*, 377 So.2d 1150, 28 U.C.C.Rep.Serv. 1155 (Fla.

---

9. As of the filing, $3,459.50 was owed Debtors by Dairymen, Inc. as milk proceeds. FmHA consented to the use of cash collateral, and a consent order was entered by the Court on February 7, 1984, allowing Debtors to use milk proceeds. The order provided that FmHA could withdraw its consent to use the cash collateral. FmHA has withdrawn its consent.

10. "Increase" is defined as the offspring of animals. Black's Law Dictionary 690 (rev. 5th ed. 1979).

11. O.C.G.A. § 11–9–306(4) (Michie 1982) concerns certain claims to proceeds in an insolvency proceeding. That section does not limit the operation of section 11–9–306(2) because there is no tracing or identification problem in this case. *Cf. Campbell v. Small Business Administration (The Jameson's Foods, Inc.)*, 35 B.R. 433 (Bankr.D.S.C.1983). *See also* Draftsmen's Comment to U.C.C. § 9–306 (1972); White & Summers at 1012–14.

1979). Under section 552(b), FmHA retains its lien on postpetition milk proceeds.[12] *See also* 4 Collier on Bankruptcy ¶ 552.02 (15th ed. 1984).

Debtors also argue that FmHA waived its security interest in milk proceeds by consenting to the periodic marketing of milk by Debtors. This question is controlled by section 11–9–306(2). Under that section, if FmHA authorized the sale of the milk, the effect of the consent is that its security interest in the milk itself is waived, but the security interest continues in identifiable proceeds of the milk sales. *See* Draftmen's Comment to U.C.C. § 9–306 (1972). Therefore, FmHA continues to have a security interest in the milk proceeds.

The next issue is whether FmHA is adequately protected so that Debtors can use the milk proceeds. Debtors argue that FmHA is only required to be adequately protected against loss of the $3,459.50 in milk proceeds that existed on the date of the bankruptcy filing. FmHA argues that adequate protection is required as to cash collateral that comes into existence after the filing.

Congress recognized that cash collateral is unique and that it requires special protection. Cash collateral is subject to change throughout the course of a bankruptcy case, and it is the most likely form of collateral to be consumed in the reorganization process. Therefore, Congress provided in section 363(e) that an entity that has an interest in cash collateral may "at any time" demand adequate protection. It is thus apparent that Congress recognized that adequate protection must be judged on the facts that exist at any given time during the reorganization process and not just as of the bankruptcy filing. *See Alchar Hardware Co. v. Wiener (In re Alchar Hardware)*, 730 F.2d 1386 (11th Cir.1984) (finding of adequate protection not final order that may be appealed because it may be reconsidered from time to time by the bankruptcy court under section 363(e)). *See also In re The Cropper Co., Inc.*, 35 B.R. 625, 11 B.C.D. 637 (Bankr.M.D.Ga. 1983); *Aegean Fare, Inc. v. Massachusetts (In re Aegean Fare, Inc.)*, 34 B.R. 965 (Bankr.D.Mass.1983).

Debtors argue that cash collateral may increase or decrease, but adequate protection is only to be provided as to the $3,459.50 cash collateral that existed at the time of the bankruptcy filing. The Court cannot agree. The clear language of section 363(a) provides that cash collateral is a cash equivalent in which a party has a security interest. Under section 552, FmHA continues to have a security interest in the postpetition milk proceeds. Since the postpetition milk proceeds are cash collateral, adequate protection is required under section 363(e) as to the postpetition proceeds. The Bankruptcy Code does not distinguish between prepetition and postpetition cash collateral. 2 Collier on Bankruptcy ¶ 363.02 (15th ed. 1984).

In this case, Debtors have not sustained their burden of showing that FmHA is adequately protected so as to authorize the use of milk proceeds. Debtors did not show equity in their assets, and there is no showing that FmHA could recover the value of its cash collateral if it is depleted. *See In re Aegean Fare, Inc.*, 34 B.R. at 968–69. Debtors have made no proposal of adequate protection, and the Court cannot allow Debtors to use the milk proceeds. Debtors must segregate the milk proceeds and not use them. 11 U.S.C.A. § 363(c)(4) (West 1979).

FmHA also argues that it has a lien against the check made payable to Mr. Hollie from the Commodity Credit Corporation under the Milk Diversion Program. FmHA argues that the check represents cash collateral, which must meet the ade-

---

12. Debtors argue that, under section 552(b), the Court should limit FmHA's security interest in postpetition proceeds "based on the equities of the case." The Court has considered this argument and finds that Debtors have not shown that the equities support a limiting of FmHA's security interest in the postpetition proceeds. *See* 4 Collier on Bankruptcy ¶ 552.02 (15th ed. 1984); *In re Lee*, 35 B.R. 663, 11 B.C.D. 337 (Bankr.N.D.Ohio 1983).

quate protection requirements of section 363(c) before it can be used by Debtors. Debtors argue that FmHA does not have a lien against the check, and that adequate protection therefore is not required.

Under the Milk Diversion Program, a farmer agrees to decrease milk production, and the Commodity Credit Corporation agrees to compensate the farmer for the reduction in milk production. FmHA argues that payments under the Milk Diversion Program are a "substitute" for the milk and the proceeds that Debtors would have received but for the program. FmHA argues that since FmHA would have obtained a lien on the milk proceeds but for the Milk Diversion Program, then FmHA's lien should attach to the Milk Diversion Program payments.

In *First State Bank v. Holder (In re Nivens)*, 22 B.R. 287 (Bankr.N.D.Tex.1982), the debtors were cotton farmers, and a bank and the Small Business Administration (SBA) had a security interest in debtors' crops. The debtors were entitled to receive deficiency payments under a support program of the United States Department of Agriculture. In finding that the bank's and the SBA's security interest attached to the deficiency payments, the court stated:

> It is apparent that checks are not "crops." However, the subsidy payments in these proceedings are at least substitute for crops or proceeds of crops. The bank and SBA, by their respective liens against crops, covered not only the crop but also the proceeds of those crops. A disaster occurred during the crop year which prevented the yield from being as great as it would have been had the disaster not occurred. The disaster payments are merely the substitute for proceeds of the crop which logically would have been received had the disaster or low yields not occurred.... The crop lien includes lien on proceeds and the deficiency payments are monies from the government which make up the difference between the amount of money actually received for the crop and that

amount which the Department of Agriculture has determined, on a nation-wide basis, that a producer should receive for a particular crop. It is logical to conclude that the deficiency payments are substitute for proceeds of crops....

> I conclude, therefore, that the bank and SBA has each properly perfected their respective liens in the deficiency payments and in the disaster payments by virtue of their liens against "crops."

*Id.* at 291–92.

Also, in *In re Lee*, 35 B.R. 663, 11 B.C.D. 337 (Bankr.N.D.Ohio 1983), the debtors entered into a crop diversion contract with the Commodity Credit Corporation prior to their bankruptcy petition. Under the contract, the debtors agreed not to plant corn, and the Commodity Credit Corporation agreed to pay a subsidy to the debtors for not planting the corn. The court found that since the creditor had a security interest in crops, the creditor's security interest should also attach to the subsidy. *See also In re Sunberg*, 729 F.2d 561 (8th Cir.1984); *Pombo v. Ulrich (In re Munger)*, 495 F.2d 511 (9th Cir.1974); *In re Barton*, 37 B.R. 545 (Bankr.E.D.Wash.1984); *In re Schmidt*, 38 B.R. 380, 38 U.C.C.Rep.Serv. 589 (Bankr.D.N.D.1984); *Wapakoneta Production Credit v. Cupp (In re Cupp)*, 38 B.R. 953 (Bankr.N.D.Ohio 1984); *In re Preisser*, 33 B.R. 65, 10 B.C.D. 1306 (Bankr.D.Colo.1983).

In this case, Debtors entered into the Milk Diversion Program contract after the bankruptcy filing, and they argue that FmHA's security interest therefore does not attach to the Milk Diversion Program payments. In support of this argument, Debtors cite to the Court the case of *In re Kruse*, 35 B.R. 958 (Bankr.D.Kan.1983). In that case, the debtors agreed not to plant crops in return for subsidy payments. The contract was entered into after the debtors filed their Chapter 11 petition. The court held that the creditor with a lien on crops and proceeds did not acquire a security interest in the payments under the contract.

122

The court ruled that disaster payments made to supplement a planted crop were substitute proceeds of the planted crop, which attached to the creditor's security interest in crops. However, the court ruled that an agreement not to plant crops in return for payment is a general intangible. The court found that the creditor's security interest did not include general intangibles, and since the right to receive the payment was acquired after the bankruptcy filing, it was free of prebankruptcy liens under section 552(a).

This Court finds that *In re Kruse* is distinguishable from the instant case. "General intangible" is defined in O.C.G.A. § 11–9–106 (Michie 1982). The definition of general intangible includes a right of performance. Draftsmen's Comment to U.C.C. § 9–106 (1972). However, a "general intangible" is a right of performance not otherwise covered by Article 9 of the U.C.C. *See Citizens National Bank v. Bornstein*, 374 So.2d 6, 27 U.C.C. Rep. Serv. 242 (Fla.1979). In *Kruse*, the creditor would not have had a lien on crops planted after the petition under section 552. *In re Kruse*, 35 B.R. at 965. *See also In re Sheehan*, 38 B.R. 859, 11 B.C.D. 835 (Bankr.D.S.D.1984). Therefore, the right to receive payments could not be a substitute for proceeds that otherwise would be the creditor's security, and could be only a general intangible. *In re Schmidt*, 38 B.R. 380, 38 U.C.C.Rep.Serv. 589 (Bankr.D.N.D. 1984).

In this case, unlike *Kruse*, FmHA's lien attaches to milk proceeds created postbankruptcy. 11 U.S.C.A. § 552(b) (West 1979). The Milk Diversion Program payments therefore are substitutes for postpetition milk and proceeds that FmHA would have a lien on but for the program. *Cf. In re Barton*, 37 B.R. 545, 38 U.C.C. Rep.Serv. 598 (Bankr.E.D.Wash.1984). *See also Wapakoneta Production Credit v. Cupp (In re Cupp)*, 38 B.R. 953 (Bankr.N. D.Ohio 1984). The Court thus concludes that FmHA's security interest attaches to the Milk Diversion Program payments.

The Milk Diversion Program payment therefore is cash collateral, and Debtors must show that FmHA is adequately protected before the payment may be used by Debtors. Debtors have neither made an offer of adequate protection nor made a showing that FmHA is adequately protected. Therefore, Debtors are prohibited from using the Milk Diversion Program payment.

Debtors also argue that FmHA seized the Milk Diversion Program check in violation of the automatic stay, and that FmHA should be held in contempt. Debtors request an award of attorney's fees, and request that the Court declare FmHA's security interest void. The Court has considered this request, and the Court does not find FmHA's action in holding the check to be punishable by contempt. *See* 2 Collier on Bankruptcy ¶ 362.11 (15th ed. 1984).