Dearold D. SCUDDER and Donna Scudder, Appellants (Defendants Below),

v.

FARMERS PRODUCTION CREDIT ASSOCIATION OF SCOTTSBURG, Appellee (Plaintiff Below).

No. 78A01–8709–CV–229.

Court of Appeals of Indiana, First District.

April 5, 1988.

Rehearing Denied June 1, 1988.

Steven A. Gustafson, Lorch & Naville, New Albany, for appellants.

Steven K. Robison, Montgomery, Elsner & Pardieck, Seymour, for appellee.

ROBERTSON, Judge.

Dearold and Donna Scudder appeal a judgment rendered in favor of the plaintiff-appellee Production Credit Association (PCA). The trial court determined that payment received by the Scudders through the federal government's milk diversion program belonged to the PCA because the PCA had a properly perfected security interest in all of the Scudders' dairy cattle and the payment was a "contract right to such secured property and an account receivable from such secured property."

We reverse.

We glean the following facts from the record. The Scudders entered into agreements with the PCA in February, 1977 and May, 1979 by which PCA took a security interest in, among other things, all of the Scudders' dairy cattle. In March, 1980, PCA advanced the Scudders approximately $84,000.00 pursuant to the agreements. Sometime thereafter, the Scudders filed a petition in bankruptcy, assigned cause No. 82–2040–NA.[1] Through bankruptcy proceedings, the cattle mentioned in the security agreements were returned to PCA and sold. The Scudders received a discharge[2], and resumed farming. No other security agreements or financing statements were executed or filed by PCA.

On April 5, 1985 Donna Scudder applied for participation in the U.S. Department of

---

1. The parties stipulated to the facts relevant to the cause. The stipulation of facts does not disclose the date of filing of the bankruptcy petition. PCA's trial brief indicates that the Scudders' bankruptcy petition was filed on November 24, 1982.

2. Again, the record does not affirmatively establish whether the Scudders' chose to proceed under chapter VII or chapter IX of the Bankruptcy Reform Act, primarily 11 U.S.C. § 101 *et seq.* PCA alleges in its complaint that the Scudders filed under chapter VII but PCA's trial brief indicates that the petition was filed under chapter XI.

Agriculture's Milk Diversion Program[3] for the period January 1, 1984 through March 31, 1985. Her application was approved on April 29, 1985. The Scudders received a payment from the federal government of $11,380.50 for their participation in the program on that day.

PCA claimed at trial that it retained a postbankruptcy security interest in the milk diversion program payment. The Scudders responded that the payment was not covered by PCA's security agreement and also argued that federal law governing the program prohibits the creation of security interests in milk diversion program payments to secure antecedent debts. The trial court entered special findings, concluding that the payment was property properly secured by the 1977 and 1979 agreements; the trial court did not address the Scudders' argument that the security agreement amounted to an assignment barred by federal law. We also will not address that argument because we find the determinative issue to be whether the milk diversion program payment received by the Scudders constituted "proceeds" of the Scudders' prebankruptcy collateral subject to PCA's security interest.

At the heart of this controversy is the description of collateral contained in PCA's financing statements/security agreements. The agreements secured an interest in "[a]ll dairy cattle but not limited to all dairy cattle," and

> 7 [a]ll property similar to that listed above, which at any time may hereafter be acquired by the Debtor(s) including, but not limited to, all off-spring of livestock, additions and replacements of livestock ... and all products of ... livestock ...
>
> 8 [a]ll proceeds of the sale or other disposition of any of the property described or referred to under Items 3 to 7, inclusive above, and of any off-spring, ... milk, ... and contract rights derived from said property, together with all accounts receivable resulting from such sales, ...

■ The trial court focused, as the appellant has, on categorizing the milk diver-

sion payment by type of collateral. *See* IND.CODE 26–1–9–106. However, there is no need to characterize the milk diversion payment as one of the types of collateral created by the Uniform Commercial Code (UCC) since whatever the nature of the property interest received by virtue of the contractual relationship between the Scudders and the Department of Agriculture, under the Bankruptcy Reform Act of 1978, 11 U.S.C. § 552(a), if it was not "property of the debtor acquired before the commencement of the case," it would not be subject to a prepetition lien.

11 U.S.C. § 552(a) sets out the general rule that property acquired postpetition is not subject to a prepetition lien:

> [e]xcept as provided in subsection (b) ..., property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

This section facilitates the "fresh start" policy inherent in the bankruptcy code as a whole by cutting off security interests obtained through after-acquired property clauses, enabling the debtor to utilize property acquired postpetition. *See* L. King, *Collier on Bankruptcy* 552–1, 552–2 (15th ed. 1987); *Local Loan Co. v. Hunt* (1934), 292 U.S. 234, 244–245, 54 S.Ct. 695, 699, 78 L.Ed. 1230; *In Re Transportation Design & Technology, Inc.* (Bkrtcy.S.D.Cal.1985), 48 B.R. 635, 640. As the commentators note, without this provision, few if any Chapter XI reorganizations would succeed because in most cases there are secured creditors with agreements containing after-acquired property clauses which would deprive the debtor of assets generated toward rehabilitation. *See Collier on Bankruptcy, supra* at 552–10.

In the present case, PCA obtained its security interest from the Scudders in 1977 or 1979. At the time the Scudders filed their bankruptcy petition in 1982, the program at issue had not yet been created by Congress. The Scudders did not take af-

---

**3.** *See Dairy and Tobacco Adjustment Act of 1983*   § 102, 7 U.S.C. § 1446(d)(3)(A) (1983).

firmative steps to obtain approval of their participation from the Department of Agriculture until April, 1985. Consequently, if the collateral was the contract itself or the payment generated by the contract, the Scudders could not have acquired "rights in the collateral" necessary for attachment of PCA's security interest until 1985, over two years after the petition was filed. *See* I.C. 26–1–9–204 (1), (2)(c), (d) (1963); *Cargill, Inc. v. Perlich* (1981), Ind.App., 418 N.E.2d 274, 277. To the extent, then, that the trial court found and concluded that the program payment was property secured by PCA's security agreements because it was a contract right or account receivable, the trial court's finding and judgment were clearly erroneous. *See* Ind.Rules of Procedure, Trial Rule 52.

█ Notwithstanding § 552(a), subsection (b)[4] creates a narrow exception for postpetition property which can be traced to a security agreement executed before commencement of the case; that is, it creates an exception for proceeds generated by *prepetition collateral,* not for property acquired by the debtor postpetition or postpetition collateral proceeds. § 552(b) provides that

> [e]xcept as provided in § 363, 506(c), 544, 545, 547 and 548 of this title, if the debtor and a secured party enter into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, off-spring, rents, or profits of such property, then such security interest extends to such proceeds, product, off-spring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to the extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

**4.** 11 U.S.C. § 552(b).

**5.** "Proceeds" includes whatever is received when collateral or proceeds is sold, exchanged, col-

The secured party relying upon this subsection bears the burden of demonstrating that the debtors' interest in the milk diversion program contract is "proceeds" or otherwise fits within the scope of § 552(b). *In Re Sumner* (D.Or.1986) 69 B.R. 758, 764; *In Re Transportation Design & Technology, Inc., supra* at 640. *See also Sandage Real Estate, Inc. v. Liebe (In Re Liebe)* (Bkrtcy.N.D.1984 Iowa), 41 Bankr. 965, 39 U.C.C.Rep. 1025, 1030; *In Re Schmidt* (Bkrtcy.D.N.D.1984), 38 B.R. 380, 38 U.C.C. Rep. 589, 591.

█ PCA did have a properly perfected security interest in the Scudders' dairy cattle and these cattle constituted prepetition collateral. Under § 552(b), if the milk diversion program payment was "proceeds" of the cattle, PCA would be entitled to payment.

Clearly, the milk diversion payment was not first generation proceeds of the cattle owned by the Scudders before the bankruptcy. The original cattle identified in the 1977 or 1979 agreements were returned to PCA and sold, and the proceeds of the sale were retained by PCA. PCA argues instead that the milk diversion payment was proceeds of the original cattle by virtue of the fact that it was the *disposition* of the original cattle through the bankruptcy which rendered the Scudders eligible for the milk diversion program. PCA derives its argument from the language of 26–1–9–306(1) which defines "proceeds" under the UCC,[5] and the intent of the UCC's drafters that the UCC be given a broad and flexible interpretation. *See e.g. Cargill, Inc., supra* at 280. PCA's argument is buttressed by the fact that the diversion payment was calculated based in part upon the Scudders' milk production during the period before the bankruptcy when they produced milk from cattle which were original collateral under the security agreements.

We acknowledge that the policy of the courts in construing UCC provisions is one of flexibility. Nonetheless, the question

lected or otherwise disposed of.... IND.CODE 26–1–9–306(1) (1963).

here is *how* broadly the definition should be interpreted; that is, to what extreme should the courts go to find a security interest when a secured party has failed to expressly include collateral in its security agreement or financing statement. We believe the following considerations weigh heavily against adopting such an expansive view of "proceeds" in the present case.

First, of critical importance is the intent of Congress in enacting § 552(a) and (b). The legislative history of the Bankruptcy Reform Act[6] indicates that the term "proceeds" was not intended to be limited to the technical definition given it in the UCC and would cover any property into which property subject to the security interest was *converted,* but "limited to the benefit inuring to the secured party thereby." S.Rep. 95–989, 95th Cong., 2d Sess. 5, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6333. Thus, while Congress intended the exception to assure that secured creditors would be entitled to proceeds of prebankruptcy collateral, it is also safe to conclude that the drafters envisioned "proceeds" to be that which arises directly from a transformation of the collateral itself and not from any other source.

In addition, the legislative history of the Bankruptcy Reform Act raises doubt that Congress intended the exception to incorporate a double recovery. *See also* B. Clark, *The Law of Secured Transactions under the Uniform Commercial Code* § 6–6[3], p. 6047 (1980). The structure of § 552 suggests such an intent as well by drawing a bright line between property actually acquired after commencement of the case and property acquired prepetition but changed in form or appearance. Moreover, the exception expressly recognizes an extension of a perfected security interest to proceeds to the extent provided by applicable nonbankruptcy law. The comments to I.C. 26–1–9–306 elucidate that under the UCC a secured party is permitted to claim both proceeds and collateral, but may have only one satisfaction. *See* West's A.I.C. 26–1–9–306, c. 3. Accordingly, once PCA received the proceeds of the sale of the dairy

cattle, it received its security. *See Stodd v. Reynard (In Re Shooting Star Enterprises, Inc.)* (9th Cir.B.A.P.1987), 76 B.R. 154, 157; *Settles v. U.S.* (Bkrtcy.C.D.Ill.1987), 69 B.R. 634.

Second, while the authorities are divided on the question of whether government entitlements to farmers are proceeds of crops or livestock, the authorities which have found entitlement payments to be proceeds have done so based upon a more traditional view of proceeds as substituted or replacement collateral. *See e.g. McLemore v. Mid–South Agri–Chemical Corp., (In Re Judkins)* (Bkrtcy.M.D.Tenn.1984), 41 B.R. 369, 39 U.C.C.Rep. 1018; *In Re Cupp* (N.D.Ohio 1984), 38 U.C.C.Rep. 592; *U.S. v. Hollie, (In Re Hollie)* (Bkrtcy.M.D. Ga.1984), 42 B.R. 111, 38 U.C.C.Rep. 1772; *First State Bank of Abernathy v. Holder, (In Re Nivens)*, (Bkrtcy.N.D.Tex.1982), 22 B.R. 287, 34 U.C.C.Rep. 1711, *Barash v. Peoples Nat'l. Bank of Kewanee (In Re Kruger)* (Bkrtcy.C.D.Ill.1986), 68 B.R. 43. These courts reason that participation in a government program is a substitute for the cultivation or production of existing collateral or farm products in which the secured party would have an interest, or that subsidies or deficiency payments are substitutes or supplements for what would have been received for secured collateral or first generation proceeds under optimal conditions in the market. *But cf In Re Kruger, supra,* reversed on rehearing 78 B.R. 538. These decisions are of no direct help to PCA because it has no interest whatsoever in the dairy cattle now possessed by the Scudders or in the milk produced from these cattle.

Moreover, none of the cases referred to above or cited by PCA have extended the definition of proceeds as far as PCA urges. Instead, when the particular program payment cannot be characterized as a substitute for or a supplement to the original collateral, the courts have tended to find entitlement payments not to be proceeds of the original collateral. *See e.g. Bechtold v. Miller (In Re Bechtold)* (Bkrtcy.D.Minn. 1985), 54 B.R. 318 (milk diversion program

6. Bankruptcy Reform Act of 1978 § 101, primarily 11 U.S.C. 101 *et seq.* (1978).

payment not substitute for milk that dead cows would have produced); *Koch v. U.S.* (*In Re Mattick*) (Bkrtcy.D.Minn.1985), 45 B.R. 615, 40 U.C.C.Rep. 704; *Matter of Schmaling* (7th Cir.1986), 783 F.2d 680; *First & Merchants Nat'l. Bank v. Ballance* (*In Re Frasch*) (Bkrtcy.D.S.D.1985), 33 B.R. 89, 42 U.C.C.Rep. 309; *In Re Kruse* (Bkrtcy.D.Kan.1983), 35 B.R. 958, 37 U.C.C.Rep. 1303; *In Re Schmidt, supra. See, also In Re Kruger, supra,* 78 B.R. 538, 541 (Three conditions for government farm subsidy payment to be proceeds; i.e., crop planted; disposition of crop; and, entitlement received in connection with disposition.) More importantly, in cases involving postpetition application and acceptance into government entitlement programs, the courts have consistently held that the resulting payment is not proceeds of prepetition collateral. *See Grunzke v. Security State Bank* (*In Re Grunzke*) (Bkrtcy.D. Minn.1987), 68 B.R. 446; *Thorp Credit, Inc. v. Fowler* (*In Re Fowler*) (Bkrtcy.N.D. Iowa 1984), 41 B.R. 962; *Bank of North Arkansas v. Owens* (Bkrtcy.E.D.Ark.1987), 76 B.R. 672; *In Re Liebe, supra. See also In Re Bechtold, supra.*

Finally, to suggest that the Scudders' eligibility turned upon the disposition of a particular herd of cattle mischaracterizes the nature of the milk diversion program. Congress devised the program in 1983 as a means of temporarily reducing the oversupply of milk and dairy products which existed in the United States as a result of an increase in both labor productivity and productive capacity per cow. *See* S.Rep. 98–163, 98th Cong., 1st Sess. 3, *reprinted in* 1983 U.S.Code Cong. & Ad.News 1658, 1666–1672. The program's goal was an immediate reduction in milk produced. Accordingly, the Department of Agriculture would make an "incentive payment" in exchange for an agreement from individual producers to produce less milk for commercial use over a fifteen-month period. *See* S.Rep. 98–163, *supra* at 1673. The milk producer would commit to a reduction between 5–30% of past production and would present a plan indicating the methods to be used in achieving the agreed reduction. Payments would be calculated by comparing current production with the past business production of the particular producer over a specified period.

Hence, while the Scudders might not have considered participation in the program had they not been forced by the bankruptcy to significantly reduce their milk production, and they were able to produce less because they hadn't acquired as many cattle as they had employed in their business previously, the Scudders became eligible for participation in the program because they agreed to cut back their present business activity, not because cattle were sold off over two years earlier. For the Scudders, who intended to remain in the milk production business, the payment was, in essence, compensation for their agreement to defer production at the higher level for a specified period of time.

PCA had an interest in a particular herd of cattle owned by the Scudders before bankruptcy; clearly it had no interest in postpetition income earned by the Scudders. Accordingly, PCA had no interest in payments made in lieu of income producing activity. Therefore, we hold that the payment received by the Scudders for their participation in the milk diversion program over two years after they filed their bankruptcy petition does not constitute proceeds of prebankruptcy dairy cattle. PCA therefore did not retain an interest in the payment. The trial court's determination that PCA was entitled to the payment is clearly erroneous, and should be reversed.

Judgment reversed.

NEAL and STATON, JJ., concur.