**In re Arnold Robert BECHTOLD and Mary Ellen Bechtold, Debtor.**

**Arnold Robert BECHTOLD, Plaintiff,**

**v.**

**Thomas MILLER, Trustee; Farmers State Bank of Hamel, Defendants.**

Bkrtcy No. 4–84–387.
Adv. No. 4–85–103.

United States Bankruptcy Court,
D. Minnesota.

Oct. 8, 1985.

Kurt M. Anderson and Mark Bloomquist (Law Clerk) Thomas P. Balyk & Associates, St. Paul, Mn., for plaintiff.

James E. Tiller, Hamel, for defendant, Farmers State Bank of Hamel.

---

Thomas F. Miller, Minneapolis, Mn., for defendant trustee pro se.

## ORDER GRANTING SUMMARY JUDGMENT FOR PLAINTIFF

ROBERT J. KRESSEL, Bankruptcy Judge.

This matter came on for hearing on cross motions for summary judgment filed by the plaintiff and by the Farmers State Bank of Hamel (bank). Kurt M. Anderson appeared for the plaintiff (Bechtold), James E. Tiller appeared for the bank, and Thomas F. Miller, the trustee, appeared *in propria personna.*

## FACTS

The bank financed the debtors' dairy farm from approximately May 1977 until they filed bankruptcy on March 9, 1984. The last renewal of the bank's debt was on August 30, 1983, when the debtors signed a note in favor of the bank in the amount of $90,985.74 and a security agreement. Pursuant to the security agreement, the debtors gave the bank a security agreement in:

(a) ALL POULTRY AND LIVESTOCK and their young, products thereof and produce thereof whether now owned or hereafter acquired, including but not limited to the poultry and livestock listed below.[1]

(b) ALL FARM EQUIPMENT of Debtor, whether now owned or hereafter acquired, including but not limited to all machinery, tools, motor vehicles, and other items listed below (insert items or types of equipment).[2]

(c) ALL BUSINESS EQUIPMENT of Debtor, whether now owned or hereafter acquired, including but not limited to (insert types of equipment): 1400 Milk Assignment filed with Mid-America Dairymen, Inc.

together with the proceeds of all of the foregoing property and, in the case of equipment and other goods, together with all accessories, attachments, parts, equipment, accessions and repairs now or hereafter attached or affixed to or used in connection therewith.

The security agreement contained boxes which were not checked for crops, feed, seed, fertilizer, medicine and other supplies, accounts and other goods. The bank admittedly did not acquire any security interest in those items. The bank's security agreement was perfected by a financing statement filed on September 26, 1980.

On January 31, 1984, Bechtold signed a contract to participate in the Milk Diversion Program with the Commodity Credit Corporation (CCC). That contract was signed by the CCC on February 1, 1984. In sum, the contract provided that if Bechtold reduced his milk production at least 30%, he would receive a payment under the Milk Diversion Program.

On February 13, 1984, the debtors sold all of their cattle for slaughter. All of the proceeds of the sale were paid to the bank. The bank's current debt is $41,809.56 plus accrued interest and costs of collection.

On March 9, 1984, the debtors filed their Chapter 7 bankruptcy case.

On April 1, 1985, the CCC issued Bechtold a check for $19,494.20 as a result of the Milk Diversion Program contract. At the time the check was issued, the debtors, the trustee and the bank all claimed an interest in the check so the trustee is currently holding that amount pending resolution of this adversary proceeding.

## DISCUSSION

The dispute between the debtors and the trustee revolves around whether or not the milk diversion payment received on April 1, 1985, well after the filing of the case, is property of the estate or not. The trustee

[1]. Specifically listed in the security agreement are:
45—Cows 3 to 6 years
13—Heifers, two year olds
10—Heifers, one year olds
10—Calves

[2]. There is also a specific list of farm equipment included in the security agreement which is not at issue in this adversary proceeding.

and the debtors have resolved and settled their dispute. The dispute between the debtors and the bank revolves around whether or not the bank has a security interest in the milk diversion payment. The debtors and the bank have both moved for summary judgment pursuant to Bankruptcy Rule 7056 and Fed.R.Civ.P. 56. The latter provides that:

the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).

The facts as set forth above and as agreed to by the parties are all the material facts and therefore this matter is appropriate for summary judgment. I conclude that Bechtold, not the bank, is entitled to judgment as a matter of law.

Bechtold argues that the milk diversion payment is not covered by the security agreement and alternatively even if it is, that federal regulations prevent the bank from obtaining a security interest in the check. I agree with the debtors on both counts.

Both parties discuss at length the case of *In re Sunberg,* 729 F.2d 561 (8th Cir.1984). However, *Sunberg* has limited applicability to this situation. In *Sunberg* the debtors' security agreement with the PCA by its terms granted the PCA a security interest in contract rights, accounts and general intangibles. The question as posed by the Eighth Circuit was whether or not PIK contracts were proper collateral to secure PCA's loans to them as a matter of state commercial law. *In re Sunberg,* 729 F.2d 561, 562 (8th Cir.1984). That question was answered in the affirmative. Therefore *Sunberg* tells us by analogy that Milk Diversion Program payments are a proper subject of a security agreement. It does not, however, answer the question of whether or not the bank in this case does have a security interest.

*Sunberg* likewise does not hold that it is a prerequisite to obtaining a security interest in these kinds of payments that the security agreement provide for accounts and general intangibles. *Sunberg* says that such language would be sufficient to obtain a security interest in these kinds of payments but *Sunberg* does not hold that such language is necessary to obtain such a security interest.

■ The real question then becomes, does the security interest by its terms and as a matter of state law give the bank a security interest in the milk diversion payment. I hold that it does not. Clearly the security agreement does not purport to grant the bank a security interest in accounts although it could have. It also does not purport to grant the bank a security interest in general intangibles which it also could have. The bank relies for its claim on the language in the security agreement giving it a security interest in products of its collateral or proceeds of its collateral. I am afraid that the bank's argument does violence both to common English and commercial usage and it is hard to comprehend how the milk diversion payment could be either proceeds or products of dead cows. The argument of the bank is that the milk diversion payment is a substitute for the milk that the cows would have produced but for the Milk Diversion Program and therefore they are entitled to the payment.

First of all, if the debtors had retained their cows rather than sell them and enter into the Milk Diversion Program, the bank's security interest in any milk would have terminated on the filing of the bankruptcy case shortly after Arnold Bechtold entered into the Milk Diversion Program. 11 U.S.C. § 552, *In re Lawrence,* 41 B.R. 36 (Bktcy.D.Minn.1984), *aff'd. In re Lawrence,* CIV 3–84–377 (D.Minn. May 17, 1984). *See also Pigeon v. Production Credit Association of Minot (In re Pigeon),* 49 B.R. 657 (Bktcy.D. ND 1985); *In re Jackels,* 55 B.R. 67 (Bkrtcy.D.Minn. 1985); *In re Serbus,* 48 B.R. 5 (Bkrtcy. D.Minn.1984).

There are cases that support the bank's position. *See Osteroos v. Norwest Bank Minot, N.A.*, 604 F.Supp. 848 (D.C. ND 1984); *U.S. v. Hollie (In re Hollie)*, 42 B.R. 111 (Bktcy.M.D.Ga.1984). While the results reached in *Osteroos* and *Hollie* may comport with those courts' concepts of equity, I do not think that equitable principles can override clear contractual language. Nothing in the security interest between the debtors and the bank covers this milk diversion payment. The proceeds of the cows was the cash received from their sale and the bank received that amount.

I conclude, therefore, that the bank's security interest does not extend to the milk diversion payment.

■ Even if the security agreement by its terms did cover the milk diversion payment, I think that it would not attach to the payment as a matter of federal law. Included in the debtors' contract with the CCC and found in paragraph 15 of the appendix is a provision that "payments which are earned by a producer may be assigned in accordance with the provisions of 7 CFR Part 709." The purpose of Part 709 of 7 CFR is to "state the conditions under which a producer may assign his payment under any ... program to which this part is made applicable...." 7 CFR § 709.1. The purposes for which a payment may be assigned are set out later:

A payment which may be made to a producer under any program to which this part is applicable may be assigned only as security for cash or advances to finance making a crop, handling or marketing an agricultural commodity, or performing a conservation practice, for the current crop year. No assignment may be made to secure or pay any preexisting indebtedness of any nature whatsoever.

7 CFR § 709.3(a). The bank argues that that section speaks only to future assignments; i.e. assignments made by the debtors after entering into the Milk Diversion Program, and would not prohibit a preexisting security interest from attaching. Although I concede that there is some ambiguity in the language itself, I think that

taken as a whole the regulations clearly indicate that the Secretary of Agriculture in adopting the regulations intended that milk diversion payments be free of claims by others and therefore provide cash for farmers to use to finance a new crop.

This regulation was apparently not raised in *Sunberg, Osteroos, Hollie* or any other reported case that I have been able to find. It may well be that if it had been, the result in the three stated cases would have been different.

THEREFORE, IT IS ORDERED:

1. The plaintiff's motion for summary judgment is granted.

2. The bank's motion for summary judgment is denied.

3. The milk diversion payment currently being held by the trustee is free of any security interest or other claim by the Farmers State Bank of Hamel.

4. There being no just reason for delay, judgment shall be entered accordingly.