In re Ralph BLACKERT, Debtor.

FARM CREDIT BANK OF ST. LOUIS, a Federally Chartered Corporation, Successor by merger to the Federal Land Bank of St. Louis, Plaintiff,

v.

STATE BANK OF ANNAWAN, an Illinois Banking Corporation, Defendant.

Bankruptcy No. 87–80665.
Adv. No. 88–8035.

United States Bankruptcy Court, C.D. Illinois.

Feb. 2, 1989.

Douglas R. Lindstrom, Galesburg, Ill., for plaintiff.

Steven T. Hunter, Davenport, Iowa, for defendant.

OPINION

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

Starting in March of 1986, the State Bank of Annawan (Bank) made a series of

loans to the Debtor. These loans can be summarized as follows:

| DATE | AMOUNT | PURPOSE | SECURITY |
|---|---|---|---|
| 3/12/86 | $40,069.24 | Crop expense | 1986 growing crops & crops in storage |
| 4/30/86 | $60,000.00 | Crop expense | 1986 growing crops and crops in storage. All payments from USDA, CCC, ASCS programs for 1986 and all subsequent years. |
| 6/10/86 | $ 9,600.00 | Cash rent | (Same as above) |
| 6/10/86 | $13,300.00 | Crop expenses & operating capital | (Same as above) |
| 8/12/86 | $ 7,600.00 | (Same as above) | (Same as above) |

In November of 1986, the Debtor owed the Bank $378,849.39 plus interest of $22,296.21, which the Debtor was not able to repay. So the Debtor and the Bank entered into a Loan Modification Agreement, which provided in part as follows:

1. The Debtor agreed to repay the notes by

A. Selling or sealing all his 1986 crops and livestock and promptly paying the proceeds to the Bank.[1]

B. Assigning to the Bank the final 1986 deficiency payment.

C. Conveying to the Bank all the Debtor's interest in certain real estate.

D. Turning over to the Bank all his machinery and equipment, except for certain designated machinery and equipment.

E. Executing a note for $45,000.00 to be secured by the farm machinery and equipment being retained by the Debtor.

2. In order for the Debtor to harvest the 1986 crop and to maintain the farm and livestock through the winter, the Bank agreed to remit from the proceeds sufficient money to pay expenses.

3. When all obligations under the Agreement had been fulfilled by both parties, mutual releases were to be executed.

4. The Bank agreed to make a 1987 production loan in the amount of $25,151.86.

At the time the Debtor signed the Loan Modification Agreement he also signed a Combined Note and Security Agreement for $45,000.00, the security being the farm machinery and equipment he was retaining. No new Uniform Commercial Code Financing Statement was filed, as one had been filed in December of 1982 and renewed in August of 1986. The Debtor also signed an ASCS assignment of payments form to have paid to the Bank the deficiency payments due the Debtor under the Agricultural Conservation Program.

On March 23, 1987, the Bank was owed the $45,000.00 and $51,090.91, the latter amount representing the value of collateral not yet liquidated, and on that date the Debtor filed a Chapter 12 proceeding in bankruptcy. The Debtor's schedules listed the Bank as a secured creditor for $45,000.00 and listed as security for the debt the 1986 deficiency payment. The rest of the debt to the Bank was not listed. On April 14, 1987, $8,090.87 of the 1986 deficiency payment was received and deposited into a special bank account at the Bank established pursuant to the Loan Modification Agreement. On May 8, 1987, the Debtor and the Bank filed a joint application to pay over to the Bank $41,866.27 in

1. The Loan Modification Agreement provides the Debtor agrees to sell or seal all his 1986 crop and livestock and as the crops are sealed or sold the proceeds will be paid to the Bank and defines proceeds to mean just that.

deficiency payments and $9,224.64 in the special bank account. Notice was sent to all creditors. No objections were filed. On June 22, 1987, the Debtor filed his plan agreeing to repay the Bank $45,000.00. On July 6, 1987, the Farm Credit Bank of St. Louis (Land Bank), also a creditor, objected to the Debtor's plan. On July 13, 1987, the Debtor and the Bank filed yet another joint application to pay the deficiency payments and the funds in the special bank account to the Bank. This time no notice was sent to creditors and an order was entered on the second application approving the payment. On December 11, 1987, the plan was confirmed subject to the Land Bank's objection being ruled on by the Court. The Land Bank's objection centered on the amount still due the Bank and the security for that indebtedness.

In order to clarify what was owed to the Bank and the nature of its security, the Land Bank sued the Bank, specifically asking that the 1986 deficiency payment be paid to the trustee and that the Court determine the extent of the lien the Bank has on the Debtor's farm machinery and equipment. After an evidentiary hearing, this Court, on August 4, 1988, held that the Bank was entitled to retain the 1986 deficiency payment and that it had a perfected security interest in the farm machinery and equipment retained by the Debtor as security for the $45,000.00 still owed to the Bank. When this Court orally announced its decision, it reserved the right to file a written opinion. On August 12, 1988, the Land Bank filed a motion requesting this Court to file its written findings of fact and conclusions of law. That motion was allowed, and this Opinion is filed in response to this Court's reservation and the Land Bank's motion.

There are three basic issues which need to be decided.[2] These three basic issues contain several sub issues. The first basic issue is whether during the whole period of time in question the Bank was a creditor claiming a security interest in the deficiency payments or if at some point it was to acquire outright ownership of them. The Court believes this to be the controlling issue. If the Bank acquired ownership, the other issues became moot. If the Bank is found to be a creditor, then the next two basic issues are whether the Bank's security interest in the deficiency payments was properly perfected, and what effect should be given to the Court's previous order approving the Debtor and Bank's second joint application to have the deficiency payments paid to the Bank.

Returning to the first issue, the Court begins by noting that in order to determine whether the Loan Modification Agreement was an extension of the security arrangement between the Debtor and the Bank, or an absolute assignment to the Bank, the Court must search for the intent of the parties. This intent is discerned from the contents of the document, the testimony of the contracting parties, and the circumstances surrounding the transaction. *Goldstein v. Madison Nat. Bank of Washington, D.C.,* 89 B.R. 274 (D.D.C.1988). This Court believes that the Loan Modification Agreement evidenced a workout transaction whereby the Bank, which considered itself to be a secured creditor, took assets, including the deficiency payments, in partial satisfaction of the debt due it; the Debtor retained certain machinery and

**2.** At the hearing the Land Bank stated it had much difficulty trying to determine just what had occurred between the Bank and the Debtor, and after having heard the testimony, at first, this Court was somewhat confused. Upon reflection, the Court believes that some of the Bank's and Debtor's actions were inexplicable in light of their intended goal, but did not alter the legal rights between them. For example, the Loan Modification Agreement defines proceeds as being those funds received from the sale or sealing of crops and livestock, yet it would appear that proceeds from other forms of collateral were treated as proceeds under the terms of the Loan Modification Agreement. Furthermore, when the Debtor filed the Chapter 12 proceeding it listed the Bank as a secured creditor in the amount of $45,000.00 with the 1986 deficiency payment being security. As it turns out, the security for that debt was farm machinery and equipment. Finally, although the Bank held an outright assignment of the deficiency payments, during the course of the bankruptcy proceedings, the Debtor and the Bank treated the deficiency payment as security and filed several joint applications for the turn over of those funds.

equipment which was security for the loans and executed a note for $45,000.00 which represented the value of the machinery and equipment which the Debtor wished to retain; and the Bank agreed to advance the costs necessary to harvest the 1986 crop and make a 1987 production loan.[3] From the point in time when the Loan Modification Agreement was executed and the assignment given, the Bank, as to the 1986 deficiency payments, was not a creditor claiming security in them, but the outright owner of the right to those payments.

■ The Land Bank attacks the transfer of the deficiency payments on the grounds that the assignment failed to comply with the Federal statute and regulations.[4] These provisions are designed to protect the Department of Agriculture against claims of payment to unauthorized payees and not to defeat what would otherwise be a valid transaction between a farm debtor and one of his creditors. *In re Sunberg*, 729 F.2d 561 (8th Cir.1984); *In re Arnold*, 88 B.R. 917 (Bkrtcy.N.D.Iowa 1988). In *In re Kruger*, 78 B.R. 538 (Bkrtcy.C.D.Ill. 1987), this Court tangentially addressed a similar attack and rejected the Trustee's argument that a bank could take a security interest in deficiency payments only if (1) the loan was made to enable the debtors to produce the crop and (2) perfection of the security interest was completed by a filing with the ASCS office for the county in which the debtors' farm was located, stating:

The effects of this particular federal statute and regulation were considered in *In re Bechtold, supra* [54 B.R. 318 (Bkrtcy.Minn.1985)], which held the security interest did not attach to the diversion payment because there had not been compliance with this federal law, and in *In re Sunberg*, 729 F.2d 561 (8th Cir. 1984), *In re Nivens, supra* [22 B.R. 287 (Bkrtcy.Tex.1982)], and *In re Kingsley, supra* [73 B.R. 767 (Bkrtcy.D.N.D. 1987)], all of which considered and rejected arguments similar to the one made by the Trustee in this case. This Court accepts the reasoning and the holdings in the latter three cases, and concludes that the defendant did not have to comply with the federal statute and the regulations promulgated thereto, in order to claim a security interest in the deficiency payments.

It is fair to note, however, that those issues were not determinative as this Court held that the bank did not, under the provisions of the security agreement, have a valid security interest in the government payments.

In *J. Catton Farms v. First Nat. Bank of Chicago*, 779 F.2d 1242 (7th Cir.1985), the court rejected the debtor's contention that PIK regulations set up a separate federal filing scheme which usurped the provisions of the UCC. The court in *Catton* stated:

[The regulations'] aim seems merely to be to protect the Department of Agriculture from liability for paying over the proceeds of a 'PIK' contract to an unauthorized payee. *In re Sunberg*, 729 F.2d 561, 563 (8th Cir.1984). Suppose the contract is with Farmer X and the Department pays X upon proof that X lived up to his side of the bargain but then Y comes along and brandishes an assignment from X and complains that the Department paid the proceeds to the wrong person. Naturally the Department wants to shield itself from such complaints by insisting that any assignment be filed with its representatives so that if there has been an assignment the Department will not pay the assignor rather than the assignee.

The suggestion that the regulation goes further and requires any secured creditor to file evidence of his security interest with the Department's representatives on pain of forfeiting his lien is pretty far-fetched. Nothing in the language of this regulation supports this interpretation and the filing form put out by the Department (Form CCC–479) is on its face a form for assigning 'PIK' contracts, not a form for recording liens.

---

**3.** That loan was never made because of the Debtor's intervening bankruptcy.

**4.** The statute and regulations can be found at 16 U.S.C. Section 590g and 7 C.F.R. Section 709.

The Department publishes no form for filing a loan agreement and it would be unreasonable to require the bank to file not merely the evidence of its security interest (that is, the loan agreement) but separate 'assignments' to it of the borrower's contractual rights every time the borrower made a new contract.

Just as the court in *Catton* held that the bank's failure to file its loan agreement with the county agricultural committee did not prevent it from enforcing its lien against the proceeds, the lack of compliance here with the provisions regarding the execution of the assignment does not defeat the Bank's interest. Accordingly, the Land Bank's argument that the assignment form is invalid because it was not witnessed as provided by the form and the regulations must fail. As the Court in *Sunberg* noted, "Simply because the government will refuse to deliver the benefits to an assignee not appearing on the proper federal forms does not mean that an assignor can totally disregard legal obligations to the assignee."

■ It must be determined, however, whether the assignment of payment form constitutes a valid assignment under state law. The applicable law was summarized by the bankruptcy court in *In re Hopkins*, 65 B.R. 967 (Bkrtcy.N.D.Ill.1986):

An assignment, whether oral or written, is the transfer of some identifiable property, claim or right from the assignor to the assignee. *Buck v. Illinois Nat. Bank & Trust Co.*, 79 Ill.App.2d 101, 106, 223 N.E.2d 167 (2d Dist.1967). At the time of the transfer, the parties must intend to effectuate an assignment. No particular language or procedure is necessary. *Id.* The intent to create an assignment is ascertained from the surrounding circumstances and the acts of the parties. *Heritage Bk. v. Recreational Retail Builders*, 97 Ill.App.3d 748, 752, 53 Ill.Dec. 189, 423 N.E.2d 573 (3d Dist.1981). (Footnote omitted)

It is clear that, under the plain terms of the Loan Modification Agreement, the Debtor intended to assign his interest in the 1986 government payment. While the "Assignment of Payment" form contains language in reference to a security interest, it also contains language of an unequivocal assignment:

The producer (assignor) assigns to the lender the payments due or to become due him/her for the farm under the programs and for year identified above, not to exceed the amount shown above.

An officer of the Bank testified that he went to the ASCS office and asked for a form of assignment and was given the form that was used, with an explanation that this was the only form available to transfer the payments. The fact that the form also uses language indicating a security arrangement cannot be used against the Bank when that is the only form available which would be recognized by the ASCS office. The Annawan Bank felt it had a valid security interest and it was obviously trying to achieve something more by executing the "Assignment of Payment." The Debtor also turned over a deficiency payment to the Bank. This evidence of what the parties to the assignment intended stands unrefuted. The Land Bank, not a party to the assignment, failed to present any evidence to establish that an outright transfer of ownership is not what the parties intended or accomplished.

■ The Land Bank also challenges the transfer on the grounds that the assignment was to pay a "preexisting" debt as that term is used in the statute and regulations. The statute provides:

A payment which may be made to a farmer under this section may be assigned, without discount, by him in writing as security for cash advances to finance making a crop, handling or marketing an agricultural commodity, or performing a conservation practice.... Such assignment shall not be made to pay or secure any preexisting indebtedness. 16 U.S.C. Section 590h(g).

The regulation provides:

(a) A payment which may be made to a producer under any program to which this part is applicable may be assigned only as security for cash or advances to finance making a crop, handling or mar-

keting an agricultural commodity, or performing a conservation practice, for the current crop year. No assignment may be made to secure or pay any preexisting indebtedness of any nature whatsoever.

In *Catton, supra,* the court commented on the provision *sua sponte:*

Catton might conceivably have gotten some mileage out of 7 U.S.C. Section 1444d(i), which applies to the ... provision which forbids assigning payment rights to 'secure any pre-existing indebtedness.' 16 U.S.C. Section 590h(g). The evident purpose is to make sure that the intended beneficiary of federal largesse retains the benefit. *See Barlow v. Collins,* 397 U.S. 159, 162–65, 90 S.Ct. 832, 835–36, 25 L.Ed.2d 192 (1970). If there is no fresh consideration for the assignment he does not. In this case, however, putting to one side the fact that Catton is a substantial corporation rather than a tenant farmer as in the *Barlow* case, the assignment—if that is what one should call the provision in the loan agreement giving the bank a security interest in any contract rights (implicitly including 'PIK' contract rights) that Catton might acquire—was made not to secure a preexisting indebtedness but as part of the inducement to the bank to make the loan; so the 'farmer' got value for the assignment. In any event, Catton, not having cited either of the above statutory provisions to us, has waived any reliance it might have placed on them.

More recently, other courts have held that this prohibition against assignments to pay or secure preexisting indebtedness prevents enforcement of an otherwise valid security interest. *In re Holman,* 85 B.R. 869 (Bkrtcy.D.Kan.1988); *In Matter of Halls,* 79 B.R. 417 (Bkrtcy.S.D.Ia.1987). In *Halls,* the court explained:

It is important to note that state law regarding secured transactions contains no such limitation on a creditor's ability to encumber government payments. This conflict between the federal scheme and state law must be resolved in favor of the federal law. It is a fundamental precept that to the extent a conflict exists between state and federal law, state law must yield. (Citations omitted)

However, the assignment to the Bank does not run afoul of that prohibition. As the court in *Holman* noted, the farmer may either assign the payment outright or grant a security interest in the payment. The court illustrated the type of "preexisting indebtedness" prohibited by the regulations:

[O]n day one creditor extends a loan to debtor, *which is unsecured.* On day thirty debtor assigns to creditor its right to receive certain ASCS payments as security for the funds loaned on day one. (Emphasis added.)

That is not what happened here. All the loans were made to produce the 1986 crop and all of them except one were to be secured by the deficiency payments. At the time they were made, the assignment had not been taken so there was a break in time between the time the loans were made and the giving of the assignment. But that does not make the assignment one for a preexisting debt. It is clear that the intended purpose of the federal provision is to finance the current crop production, and with that purpose in mind, prohibits assignments to secure preexisting debts and thereby keep those payments free for crop production loans. In the case before this Court, the purpose of the loans was to produce the 1986 crop, and the purpose of the assignment was to pay for the 1986 crop production loans. At the time the assignment was executed, the Bank claimed a security interest in the deficiency payments, dating back to when it made the production loans. The assignment was not given to pay any previous years' loans.

Although the ruling on the first issue is controlling, the Court will rule on the remaining issues raised by the Land Bank. Hopefully it will help to eliminate some of the Land Bank's confusion as to what occurred in this matter.

█ The second basic issue is whether the Bank was a validly perfected secured creditor. The Land Bank made several attacks against the Bank's position as a perfected secured creditor. Before addressing

the specific attacks made by the Land Bank, a general discussion of some of the basic principles of the Uniform Commercial Code is appropriate. In order for a creditor to be a perfected secured creditor, the security interest must attach pursuant to Section 9–203 of the Uniform Commercial Code, Ill.Rev.Stat.1987, Ch. 26, para. 9–203, and the creditor must perfect its security interest pursuant to Section 9–401, Ill.Rev. Stat.1987, Ch. 26, para. 9–401. *First Federal Savings & Loan Assn. of Chicago v. Pogue,* 72 Ill.App.3d 54, 27 Ill.Dec. 588, 389 N.E.2d 652 (2d Dist.1979). In order to have attachment, Section 9–203 requires a written agreement, signed by the debtor, value to be given, and the debtor having rights in the collateral. In the case before this Court, the Debtor signed Combined Notes and Security Agreements, the Bank gave value in the form of the loans, and the Debtor had rights to the deficiency payments. So attachment occurred, at which time the rights and obligations between the Debtor and the Bank were created. *First Galesburg National Bank & Trust Co. v. Martin,* 58 Ill.App.3d 113, 15 Ill.Dec. 603, 373 N.E.2d 1075 (3d Dist.1978). However, to cut off the rights of third parties, perfection was required. *Citizens State Bank of Lena v. Diemer,* 144 Ill.App.3d 513, 98 Ill.Dec. 897, 494 N.E.2d 1224 (2d Dist.1986). Section 9–401 of the Uniform Commercial Code governs the place of filing, and Section 9–402 governs the formal requisites of the financing statement. Ill.Rev.Stat.1987, Ch. 26, paras. 9–401, 9–402. The Land Bank's first attack is that the financing statement does not contain a statement indicating the type or describing the items of collateral. The financing statement describes the collateral as being:

All of the following items or types of property whether now in existence or hereafter acquired by whatsoever means in which the undersigned owns or has an interest, including all accounts receivable, proceeds, substitutions for, and contract rights arising therefrom; all livestock and feed stuffs pertaining thereto, all growing crops, all stored grains including but not limited to corn and soybeans, all farm machinery of all descriptions plus parts, accessories and tools.

■ There is no specific reference to the deficiency payments. Therefore, the first sub issue is whether the quoted language can be construed to include them. The analysis begins by determining whether the reference to accounts receivable, proceeds, substitutions and contract rights is an attempt to create a security interest in those types of collateral, or if it is referring to collateral which arises or flows out of the types of collateral described later in the financing statement. Stated another way, was the Bank attempting to perfect a security interest in accounts receivable, etc., or was it attempting to perfect a security interest in livestock and crops and any accounts receivable, etc. generated by the sale or other disposition of livestock or crops. The Court believes the latter was intended. The language groups together in a single phrase all the questionable language. The term "proceeds", which is part of the questionable language, is not a first generation classification of collateral under the Uniform Commercial Code.[5] Under the Commercial Code proceeds are considered to be a second generation of collateral, a type of collateral that springs from a first generation type collateral. For example, if crops are sold on account, the account receivable would be considered to be proceeds. Finally, the questionable language uses the term "substitutions for" and "arising therefrom" which indicates the types of collateral described by the questionable language will be flowing from yet another type of collateral. Therefore, the Court concludes that the Bank was claiming a security interest in livestock and crops and the accounts receivable, proceeds, substitutions for, and contract rights arising therefrom.

Having reached that conclusion, the Court must now determine whether deficiency payments come within the scope of the questionable language of the financing statement. It is apparent that government

---

5. First generation collateral is normally classified as either consumer goods, equipment, farm products, or inventory. *See* Section 9–109. Ill. Rev.Stat.1987, Ch. 26, para. 9–109.

deficiency payments are not "growing crops" or "stored grain". The question is whether they fall within the other types of collateral listed on the financing statement. They do not. The term "contract rights" is meaningless, as that term was deleted in 1973 from the Uniform Commercial Code as adopted in Illinois. *See* Illinois Code Comments to Section 9–106, Ill.Ann.Stat. Ch. 26, para. 9–106 (Smith–Hurd 1974).

Before the Court discusses the remaining language of the financing statement, a brief discussion of the nature of the deficiency payments is appropriate. In *Kruger, supra*, this Court had occasion to make such an analysis:

> The deficiency payment is designed to provide an income supplement to the farmer by insuring an adequate price for his crop. In this program, the farmer must plant a crop. The deficiency payment is determined by multiplying the number of acres planted (not harvested) by the farmer times the established historical yield (not actual yield) for that farm land times the difference between the national average market price for the crop and a "target price" for that same crop. If the price of the crop doesn't reach the target price, the farmer then gets the deficiency payment up to a maximum amount as set by the program. The deficiency payment is not tied to the farmer's actual yield. The deficiency payment will not be changed if a particular farmer's yield is larger or smaller than the government's established historical yield. Nor is the deficiency payment in any way linked to "sealing". Except as previously noted, to get the "sealing profit", the farmer must participate in this third program. But the reverse is not true, and the farmer does not have to "seal" to participate in this third program. The farmer will receive the deficiency payment regardless of whether he harvests or sells the harvested crop. For example, he could fail to harvest the crop or he could harvest the crop and keep and use it and still receive the deficiency payment.

Considering the nature of the deficiency payments, they cannot be classified as accounts receivable under Section 9–106 of the Uniform Commercial Code. An account receivable is defined to be a right to payment for goods sold or leased, or for services rendered which is not evidenced by an instrument or chattel paper. Ill.Rev. Stat.1987, Ch. 26, para. 9–106. As the Debtor was entitled to the deficiency payments regardless of whether he sold the crop or not, the deficiency payments cannot be accounts receivable. Nor can the deficiency payments be considered a "substitute". "Substitute" means to put in the place of another, or to exchange. As the payment is an income supplement and can be obtained even if the crop is not harvested and disposed of, the payment cannot be classified as a substitute for the crop. Finally, for the following reasons set forth in *Kruger, supra*, the deficiency payments cannot be considered to be proceeds.

Having determined the nature or basis of deficiency payments, the next step is to determine whether deficiency payments are "proceeds" within the definition of Section 9–306 of the Uniform Commercial Code. Section 9–306 of the Uniform Commercial Code as adopted in Illinois (Section 9–306, Ch. 26, Ill.Rev. Stat.) defines "proceeds" as being "whatever is received upon the sale, exchange, collection, or other disposition of the collateral". In *In re Schmaling, supra* [783 F.2d 680 (7th Cir.1986)], the court had before it the issue of whether a PIK payment was "proceeds". After first noting Section 9–306 required a sale, exchange, collection or other disposition of the collateral for there to be "proceeds", the court went on to hold the PIK payments were not "proceeds", as no crops were planted and there were no crops which could be disposed of and give rise to "proceeds". The Trustee would have this Court broadly apply *In re Schmaling* by holding a government farm subsidy payment, regardless of its nature, can be claimed as security only where the creditor's security agreement and financing statement specifically refer to it. This Court does not agree this is the result required by *In re Schmaling*.

This Court's reading of *In re Schmaling* is that for a government farm subsidy payment to be considered "proceeds", three conditions must be present: First, a crop must be planted; second, there is a disposition of the crop; and third, the entitlement which the secured creditor is claiming must have been received in connection with that disposition.

In the context of a deficiency payment, the first condition is met—i.e. a crop must be planted. The payment is tied to a planted crop. However, neither the second nor the third conditions are met. The payment is in no way dependent upon a sale, exchange or other disposition, nor does it flow from a sale, exchange or other disposition. The payment is the result of a contract with the federal government to provide an income supplement to the farmer. The payment will be made regardless of whether the crop is the object of a "sale, exchange, collection, or other disposition". It will be made even if the crop is never harvested, or if harvested, if the farmer keeps and uses the crop. Furthermore, the payment is calculated on an estimated, not an actual, yield. As stated by the court in *In re SMS, Inc.*, 32 UCC Rep. Serv. 1631; 15 B.R. 496 (Bkrtcy.D.Kan. 1981), the term "proceeds" means "whatever is *substituted* for the original collateral". (Emphasis added) Accordingly, a creditor has a security interest in the crop and whatever is received for the crop upon its sale, exchange, collection or other disposition. There has to be a sale or other disposition of the crop in order for something to be received in its place. In this case the deficiency payment would have been received regardless of whether there was a sale or other disposition. Therefore, it cannot be said that it was received as a substitute for a disposed-of crop. The foregoing analysis leads this Court to the conclusion that deficiency payments are not proceeds under Section 9–306 of the Uniform Commercial Code.

The Bank argues that this Court's decision in *Kruger, supra,* is not controlling, because in a previous *Kruger* decision reported at 68 B.R. 43, this Court held deficiency payments were proceeds, and that the Bank relied upon that decision. While it is true that in the first *Kruger* decision this Court held deficiency payments were proceeds, on reconsideration, in the second *Kruger* decision, this Court reversed its position. The Bank's argument is not persuasive, for two reasons. First, although our judicial system is based in part on the concept of *stare decisis,* the concept is not so rigid so as to prohibit a court from correcting what it perceives to be an incorrect decision. Second, the *Kruger* rulings could not have had any impact on the Bank's initial action in taking the financing statement and security agreements and its subsequent action of taking the Loan Modification Agreement, as both actions occurred before either of the rulings. Many other creditors, like the Bank here, really had not given much thought to the proper procedures for taking a security interest in deficiency payments and have been caught with improper documentation when farmers started to encounter financial difficulties and began filing bankruptcies.

The Land Bank also attacks the perfection by contending that the Bank's financing statement was improperly filed. Section 9–401 of the Uniform Commercial Code provides that when the collateral is accounts, or general intangibles, arising from or relating to the sale of farm products that the filing is to be in the Office of the Recorder of Deeds and in all other cases the filing is with the Secretary of State. Ill.Rev.Stat.1987, Ch. 26, para. 9–401. Section 9–106 of the Uniform Commercial Code defines general intangibles as any personal property, (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money: The right to the deficiency payments would be classified as a general intangible, but as it doesn't arise out of, or from, or relate to, the sale of farm products, the proper place for filing would be in the office of the Secretary of State. *In re Cordes,* 65 B.R. 678 (Bkrtcy.N.D.Ill.1986). *See also In re*

*Winterroth,* 97 B.R. 454 (Bkrtcy.C.D.Ill., 1988) (J. Fines).

Therefore, on this second issue the Court finds for the Land Bank and holds that the Bank was not properly perfected, as (1) the Financing Statement did not describe as part of the collateral the deficiency payments; and (2) the filing was improperly made with the Recorder of Deeds rather than with the Office of the Secretary of State.

The last issue has to do with the effect to be given to this Court's previous order on the Debtor and Bank's joint application to have the deficiency payments paid to the Bank. An additional statement of facts is appropriate at this time. In May of 1987, the Debtor and the Bank filed a joint application to have the deficiency payments paid to the Bank. In that joint application it was stated that the Debtor was obligated to the Bank pursuant to the Loan Modification Agreement, and that the Bank held collateral in Bank Account No. 0112565 at the Bank and in the 1986 deficiency payment.[6] In this application, the reference to these items is as cash collateral, and the Bank asks that these items be turned over to it. Notice is sent to creditors, giving the creditors an opportunity to object. No creditor objects. However, the trustee does. The trustee's objection is set for hearing on July 17, and on July 10, just ten days before the July 17th hearing, the Bank's attorney writes to the trustee forwarding a dismissal of this joint application, and a new joint application. In his cover letter, the Bank's attorney asked the trustee to forward the matters on and to request a bar date for the second joint application. This letter is directed to the trustee and not to the court. The trustee, when he receives the cover letter, forwards it on to the bankruptcy clerk's office with a scribbled note on it requesting a file stamped copy. The bankruptcy clerk's office received the trustee's communication on July 13, which is four days before the July 17th hearing. The bankruptcy clerk's office does not have time to send out a notice on this second joint application. When the Deputy Bankruptcy Clerk reviews the first application and the objection thereto, and sees that the trustee has joined in the second application, she believes everything is resolved, and submits an order to the Court for signature. The Court signs the order without noticing the fact that notice should have gone to creditors on the second joint application.

The second application is slightly different from the first application. Paragraphs 1 through 3 are the same. Paragraph 4, however, is different. It now reads that the Debtor has no equitable interest in the account or the deficiency payment and that they should be turned over to the Bank pursuant to the Loan Modification Agreement. Paragraph 5 is new. It says that the trustee agrees that these items are not property of the estate.

The Court can only assume that the Bank had some reason for dismissing the first application and filing the second application, and that it was attempting to effect some legal rights. If the second application was to have any legal impact on the bankruptcy proceeding, notice should have gone out to creditors. As notice did not go out to creditors, the subsequent order cannot be considered to be binding on it.

■ The Bank's position is also weakened by the fact that it requested notice, and when it received the order without notice having gone to creditors, it could have taken steps to have corrected the matter rather than sitting back and doing nothing, and attempting to rely on the order. Finally, a court can always vacate one of its own orders if it feels that it is in the best interest of justice to do so. *See In re Johnson & Morgan Contractors,* 29 B.R. 372 (Bkrtcy.M.D.Pa.1983). For these reasons, the Court finds that its previous or-

---

6. Going back to an earlier statement, this is an example of the type of things that confused the issues in this case. Although the Bank is claiming an ownership in the deficiency payments, reference is made to a collateral position. The record is not clear whether the Bank was just being conservative to make sure it wasn't violating the automatic stay and utilized improper language.

der is not a bar to the Land Bank's objections to the secured position of the Bank.

In conclusion, the Court believes that the Bank is entitled to retain the 1986 government deficiency payment, and that the Bank has a secured claim in the amount of $45,000.00, secured by the Debtor's farm machinery and equipment which he retained pursuant to the Loan Modification Agreement.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure, and the Land Bank's Motion and this Court's Order entered pursuant thereto.